**UNITED STATES of America,**
**Appellee,**

v.

**James Douglas DAVIS, Appellant.**

**No. 567, Docket 32352.**

United States Court of Appeals
Second Circuit.

Argued June 19, 1968.

Decided July 17, 1968.

Certiorari Denied Dec. 9, 1968.

See 89 S.Ct. 465.

---

H. Elliot Wales, New York City, for appellant.

James W. Brannigan, Jr., Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for the Southern Dist. of New York, Elkan Abramowitz, Asst. U. S. Atty., on brief), for appellee

Before MOORE and FRIENDLY, Circuit Judges, and BRYAN, District Judge.*

FRIENDLY, Circuit Judge:

The principal question on this appeal from a conviction under the Dyer Act, 18 U.S.C. § 2312, concerns the application of the identification trilogy of June 12, 1967, United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, and Sto-

vall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, to circumstances quite different from the ones there presented.

The charge here was that defendant Davis had knowingly participated in the transportation of a stolen white 1960 Pontiac from Massachusetts to New York on or about January 12, 1968. In addition to proving that the car was a stolen vehicle, the Government presented its case primarily through three witnesses. These were Charland, a collector at Toll Booth B–1 on a spur of the New York Thruway leading to the Massachusetts Turnpike; Murray, a New York State Trooper, assigned to policing that section of the Thruway at the time; and Eisele, an agent of the F.B.I.

Charland testified that he had seen the Pontiac pass through his toll booth eastbound early on the morning of January 13; that Davis was driving the car, which had another passenger; and that Davis asked the way to Boston. On cross-examination Charland said his attention was directed to the car because it was overheated. He admitted that Murray had shown the two young men to him a bit later in the morning but denied he had professed inability to make a positive identification—as a report by Murray dated January 15 recited.

Murray testified that about 7:45 A.M. on the morning of January 13, he observed the Pontiac on the righthand shoulder of the Thruway, eight miles east of Booth B–1, empty and apparently overheated. When he reported the license and identification to his dispatcher, he was informed there was no record of the auto being wanted or stolen. Going to the office building near Toll Booth B–2, he found Davis and another young man. They told Murray they were trying to get back to Massachusetts. Davis denied having anything to do with the Pontiac; he said he had gotten a ride from Albany from an unknown driver of a red Chevrolet who had dropped them off on the Thruway in front of exit B–2. Murray placed the two under arrest for being

* Of the Southern District of New York, sitting by designation.

pedestrians on the Thruway, see N. Y. Vehicle and Traffic Law, McKinney's Consol. Laws, c. 71, § 1630. Cross-examination, outside the presence of the jury, elicited that Murray had given Davis none of the *Miranda* warnings; that he drove the young men back to a police station in East Greenbush, N. Y.; that, stopping en route at Toll Booth B–1, he asked Charland whether he had ever seen them, and Charland indicated he had; and that Murray asked Charland which one had been driving, to which Charland responded by indicating Davis. Confronted with his January 15 report, Murray said he considered Charland's statement a positive identification.

Agent Eisele testified to an interview with Davis on January 16, while the latter was in jail at Hudson, N. Y. Eisele began the talk by saying that he and his partners were there to discuss the theft of the Pontiac. According to his testimony, which the judge permissibly accepted despite partial contradictions by Davis,[1] Eisele orally gave full *Miranda* warnings and Davis read and signed the FBI's "YOUR RIGHTS—WAIVER OF RIGHTS" form. Eisele testified that after all this, Davis admitted that he and a friend, Horgan, had been drinking in a Braintree, Mass., bar on the afternoon of January 12; that Horgan left the bar and returned, saying he had a 1960 Pontiac which he had stolen; that they drove to Albany, N. Y., where they continued imbibing until the next morning when the bar closed; that they then headed back to Massachusetts but the car overheated and they abandoned it; and that they proceeded to walk to a toll booth to ask how to get to the nearest railroad station and also to warm up. Eisele admitted on cross-examination that Davis had told him Horgan was driving.

Although appellant's counsel has preserved objection to the receipt of Davis' statement to Eisele, his main attack in this court is on Charland's identification. Here, as in United States v. Wade, supra, the prosecution elected not to use the on-the-scene identification but to rely on one made in court. Davis' counsel was thus confronted with what Mr. Justice Brennan described as "the predicament" of "having to probe in the dark in an attempt to discover and reveal unfairness, while bolstering the government witness' courtroom identification by bringing out and dwelling upon his prior identification." 388 U.S. at 240–241, 87 S.Ct. at 1939.[2] If there was unfairness in Charland's identification, Davis would thus be entitled to a new trial unless, as would seem unlikely in this case, the Government could "establish by clear and convincing evidence that the in-court identification were based upon observations of the suspect" other than those made at the prior identification. 388 U.S. at 240, 87 S.Ct. at 1939.

The claim is that the Sixth Amendment forbade the trooper's asking the toll booth collector whether he had ever seen Davis without according the latter the assistance of counsel. The facts are a long way indeed from *Wade*, where the FBI conducted a lineup 39 days after Wade's post-indictment arrest and 15 days after the appointment of

---

1. The judge required the *voir dire* examination of Eisele, although not of Davis, to be conducted in the presence of the jury. We think it preferable that such examinations be conducted initially outside the presence of the jury. If, as here, the judge decides the issue of admissibility and does not resubmit this to the jury, there will be no occasion for the latter to hear the testimony. On the other hand, if the judge follows the "Massachusetts procedure," see Jackson v. Denno, 378 U.S. 368, 378–379 & n. 8, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), under which the jury also passes on the issue, the jury must then hear whatever is competent and relevant. However, we find no prejudice to Davis in what was done.

2. Although here counsel astutely avoided the predicament by examining Murray, rather than Charland, outside the presence of the jury, we see no reason why the predicament should not be alleviated by allowing an examination outside the presence of the jury with respect to the identifying witness himself.

counsel for him, without giving notice to the lawyer. They are equally far from *Gilbert* where a particularly offensive lineup was conducted 16 days after indictment and the appointment of defense counsel, again without notice to the lawyer. The *Wade* opinion mentions "the post-indictment lineup" and notes, referring also to *Gilbert*, "that in the two cases in which the right to counsel is today held to apply, counsel had already been appointed and no argument is made in either case that notice to counsel would have prejudicially delayed the confrontations." 388 U.S. at 237, 87 S.Ct. at 1938. While the difference from *Stovall* is somewhat less sharp, the defendant there had been arraigned before a judge and had indicated his intention to get a lawyer, and the judge could readily have assigned counsel for the limited purpose of accompanying Stovall to the confrontation at the hospital if the prosecutor had revealed his intention to conduct one. See 2 Cir., 355 F.2d 731, 744–745 (dissenting opinion).

The problem here arises from expressions in the opinions in these cases which are contended by appellant's counsel to outrun their facts:

"In sum, the principle of Powell v. [State of] Alabama [287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158] and succeeding cases requires that we scrutinize *any* pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." United States v. Wade, 388 U.S. at 227, 87 S.Ct. at 1932.

"But the confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially derogate from a fair trial. Id. at 228, 87 S.Ct. at 1933.

"The pretrial confrontation for purpose of identification may take the form of a lineup, also known as an 'identification parade' or 'showup,' as in the present case, or presentation of the suspect alone to the witness, as in Stovall v. Denno, supra. It is obvious that risks of suggestion attend either form of confrontation and increase the dangers inhering in eye-witness identification. But as is the case with secret interrogations, there is serious difficulty in depicting what transpires at lineups and other forms of identification confrontations." Id. at 229–230, 87 S.Ct. at 1933.

"We have, therefore, concluded that the confrontation is a 'critical stage,' and that counsel is required at all confrontations." Stovall v. Denno, 388 U.S. at 298, 87 S.Ct. at 1971.

■ The question is just what the Court meant by "confrontation." Murray's exhibition of Davis and Horgan to Charland was surely one in the dictionary sense. But so would be a case where a man running away from the scene of an assault was collared by an officer who asked the victim and the bystanders whether the man was the perpetrator. It is hard to believe the Court meant to prevent an officer from making such a routine, uncontrived inquiry and to require that the victim and the bystanders be carted off to a police station, held on the spot until counsel could be provided, or dismissed until a lineup attended by counsel could be arranged at some later time. We do not read *Wade* and its siblings as saying that the mere fact of custody, especially when this is for an unrelated crime, automatically triggers the Sixth Amendment right to counsel, as it would the Fifth Amendment privilege against self-incrimination. The importance of custody from a Fifth Amendment standpoint is that it is conceived as furnishing the element of compulsion

which that Amendment demands, see *Miranda v. State of Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The protection of the Sixth Amendment applies to "the accused" in "all criminal prosecutions," and while *Wade* makes clear that this includes certain pretrial proceedings, 388 U.S. at 224–225, 87 S.Ct. 1926, that is a long way from saying that the protection attaches as soon as suspicion is aroused. The fact of custody adds little of Sixth Amendment relevance, especially when, as here, this is for an unrelated crime. Counsel would have been equally useful if Murray had simply invited Davis and Horgan to ride back to the police station where the trooper would make a further check on the ownership of the Pontiac, yet we can see no textual or other basis for reading the Sixth Amendment to accord that.

A clue to the dividing line may be furnished by the Court's repeated use of the term "accused" and its reference in *Wade*, 388 U.S. at 225, 87 S.Ct. 1926, to *Escobedo v. State of Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). We have particularly in mind the passage in that opinion, 378 U.S. at 485–486, 84 S.Ct. at 1762:

> " * * * the investigation had ceased to be a general investigation of 'an unsolved crime' * * *. Petitioner had become the accused, and the purpose of the interrogation was to 'get him' to confess his guilt despite his constitutional right not to do so. * * It would exalt form over substance to make the right to counsel, under these circumstances, depend on whether at the time of the interrogation, the authorities had secured a formal indictment. Petitioner had, for all practical purposes, already been charged with murder."

The situation here had come nowhere near the accusatory stage there depicted. Indeed, it had not advanced as far as the case against Miranda, Vignera, Westover and Stewart where the Court did not find a violation of Sixth Amendment rights as such, 384 U.S. at 513–86 S.Ct. at 1648–1649 (dissenting opinion of Mr. Justice Harlan), and relied rather on "the need for counsel to protect the Fifth Amendment privilege," 384 U.S. at 470, 86 S. Ct. at 1626—a privilege which is not implicated by requiring even a person formally accused "merely to exhibit his person for observation by a prosecution witness prior to trial." Wade v. United States, supra, 388 U.S. at 222, 87 S.Ct. at 1930. Murray did not know that a crime, other than the minor offense of walking on the Thruway, had been committed by anyone; his last information gave no indication the Pontiac had been stolen. Still less was he in a position to accuse Davis of participation in such a crime. While doubtless he was suspicious on both scores, investigation was precisely his job, and it was in the course of proper investigation that he asked Charland what he did. On the basis of what Murray knew when he asked whether Charland had seen the two young men who, on Davis' own prior admission, had passed through Booth B–2 only a short while before, he would have had no possible justification for insisting that Charland go to a police station or that Davis be held at the toll booth until counsel was summoned. As recently said by the Supreme Judicial Court of Massachusetts, *Commonwealth v. Bumpus*, 238 N.E.2d 343 (Cutter, J.), "Reasonable confrontations of this type, in the course of (or immediately following) a criminal episode, seem to us to be wholly different from post-indictment confrontation (such as those in the *Wade* and *Gilbert* cases) in serious crimes after a significant interval of time, and in the absence of already appointed counsel."

Since we conclude that the trilogy do not cover this case, we need not consider the applicability or validity of 18 U.S.C. § 3502, added by the Omnibus Crime Control and Safe Streets Act of 1968, P.L. 90–351, 82 Stat. 197.

Affirmed.