**UNITED STATES of America, Appellee,**

v.

**Charles T. BENNETT, Wilbert Haywood, Elmer Jessup, Henry Stanton and Farris Thomas, Appellants.**

**Nos. 214–216, Dockets 32327, 32328 and 32336.**

United States Court of Appeals Second Circuit.

Argued Dec. 5, 1968.

Decided Feb. 26, 1969.

---

See also, 291 F.Supp. 461.

Frederic A. Johnson, New York City, for appellant Wilbert Haywood.

Irving Younger, New York City (Michael O. Finkelstein, New York City, of counsel on the challenge to the Grand Jury), for appellants Charles T. Bennett and Henry D. Stanton.

Robert Kasanof, New York City, for appellant Elmer Jessup.

Patrick M. Wall, Washington, D. C. (Edward Bennett Williams, William E. McDaniels, Washington, D. C.), for appellant Farris Thomas.

Charles P. Sifton, Ass't. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for the Southern Dist. of New York, Abraham D. Sofaer, William B. Gray and Paul K. Rooney, Ass't U. S. Attys., on the brief), for appellee.

Before LUMBARD, Chief Judge, FRIENDLY, Circuit Judge, and FRANKEL, District Judge.*

FRIENDLY, Circuit Judge:

The five appellants, Bennett, Stanton, Haywood, Jessup and Thomas were the subjects, along with nine co-defendants and four co-conspirators, of a single count indictment in the District Court for the Southern District of New York, charging them with having engaged in a conspiracy to import narcotics and to distribute these in the United States in violation of 21 U.S.C. §§ 173–174. The case against eight defendants was severed, and the jury acquitted a ninth, Harris. Appellants were convicted and given heavy sentences, ranging from 12 to 20 years.

The prosecution's evidence showed a sizeable conspiracy of the familiar "chain" type. The entrepreneurs were three Australians—appellant Bennett, Hopes and Egan—who bought heroin in Hong Kong at low prices starting around May 1966, and had couriers convey it on their persons by air to the United States, generally to New York, where the principals would distribute it at a large mark-up. During the seven-month life of the conspiracy a number of couriers were employed, including appellant Stanton as well as Reid, Lewis and Summerill, who were the Government's principal witnesses at the trial. Appellants Haywood, Jessup and Thomas were distributors in New York.

It is unnecessary to make a complete statement of the colorful evidence. None of the appellants challenges its sufficiency—indeed, the record fairly shrieks of guilt—and some of it is summarized in footnotes 1–4. At this point we shall recount only the last stages of the drama

* Of the Southern District of New York, sitting by designation.

since they give rise to a number of the arguments made on appeal.

Reid on his penultimate trip from Hong Kong in early November, 1966, carried 25 one ounce packets of heroin which Stanton delivered to him there. In addition Reid approached a rickshaw boy named Muk, who had already served as a source of supply, and purchased with his own funds an additional six ounces for $600. On arriving in New York Reid delivered the 25 ounces to Egan and received $4,500; Egan also bought the six ounces for $2,400, apparently with knowledge of their separate origin. When Reid returned to Hong Kong late in the month, Hopes propositioned him for a final trip. The arrangements for this were to be somewhat altered. Instead of being a paid employee, Reid was to buy the heroin from the syndicate in Hong Kong at $200 per ounce with his own funds, pay his own expenses and resell to it in New York at $1,000 an ounce. This trip was postponed and, in early January, 1967, Egan, then in Hong Kong, got in touch with Reid and made a still different proposal, namely, that Reid buy heroin there from his own source of supply and sell it to Egan in New York for $600 an ounce. It is clear this proposal was independent of the one made by Hopes and Bennett, since it offered Reid a much smaller margin of profit. Bennett came to Hong Kong a few days later. He told Reid that he was endeavoring to find a better quality of heroin and that the trip on which Reid would earn the $800 differential per ounce would have to be postponed again. Reid indicated he had his own source of pure heroin, again via Muk the rickshaw boy, and inquired whether the syndicate would be prepared to buy from him in New York. Bennett thought it would be better if Reid would wait a week until Hopes' arrival. Reid decided not to wait, went immediately to Muk, bought some 26 ounces of heroin the next day, and boarded a plane for Honolulu. There two United States customs agents arrested and searched him and found on his person the heroin and a card with the names and phone numbers of Egan and Jessup.

Reid decided to cooperate. He and two federal agents flew to New York, where they registered at a hotel. They installed in Reid's room a tape recorder and a microphone leading to an adjacent room. Reid telephoned a woman whose name and number Egan had given him. Shortly thereafter Egan called, said he had picked up "some unwanted friends" and had been obliged to leave town but would send "Caroline," the code name for Haywood,[1] who would identify himself by a password. Haywood did not appear but, after more telephoning and the lapse of several days, defendant Harris did and was promptly arrested.

On the same day, January 12, 1967, Egan was arrested in a room registered under the name of Austin Burke at a Miami Beach hotel. Found on him was an envelope with the partially obscured notations "Caroline" and "Glen," which was Reid's first name. Haywood was arrested the same evening in his Greenwich Village apartment; the agents discovered an apparatus used in determining the purity of drugs and $5,000 in cash. Jessup was also arrested that day in his Manhattan apartment;[2] the agents found an address

1. The first mention of Caroline's name was a designation given in mid-November by Hopes to Summerill in Hong Kong for use in the event that Summerill could not locate Egan on arriving in New York. Summerill called Egan's apartment, and found the defendant Hill there. Ultimately Hill met Summerill and they went to the apartment. The phone rang and Hill announced, "We got a customer." Shortly Haywood entered the apartment, was introduced by Hill as "Caroline," and received a quantity of heroin. There was also evidence that Egan and Hill had driven to Haywood's apartment in early January.

2. Jessup's name appears in the conspiracy as early as the summer of 1966 when, as Lewis testified, Hopes spoke of him as the "Dog" and told Lewis that "if ever anything gets stuck," Jessup was

book and a business card containing the telephone listings of Egan, Thomas, Hopes and "Carolina"; a list of names and numbers headed by "Carolina— 5400," and a slip containing the address of Egan's apartment and the name "Thomas."

Thomas' arrest [3] came seven weeks later, in his Manhattan apartment. The agents found two address books both of which contained the telephone numbers of "Dog," a business card of "Austin Burke," Egan's assumed name, and a letter from Egan, of which more hereafter.[4]

## I. The Grand Jury

■ The sole point briefed by appellants Bennett and Stanton concerns their challenge to the method of grand jury selection in the Southern District of New York. With the approval of the trial judge it was stipulated that similar motions made before Judge Tyler in United States v. Leonetti, 291 F.Supp. 461 (S.D.N.Y.1968), would be considered to have been made here, and that his decision thereon would be deemed the decision in this case as well. In a careful opinion Judge Tyler overruled the challenge. The basic contention of the movants was that the jury selection

system [5] operated unfairly to minimize participation by black and Puerto Rican citizens and, generally, by the urban poor. Conceding that "Gross disparities in the representation of any identifiable group in the community of course serve to call scrutiny to the system," the judge concluded that "the disparities relied upon by movants are almost completely the product of the hardship excuse procedures." He found also that the attack based on the long discarded practice of choosing grand jurors by relying in part on impermissible sources such as recommendations of the Grand Jury Association, the Social Register, and real estate listings, as against voter registration lists, had much less force today than when it was rejected years ago in United States v. Dennis, 183 F. 2d 201, 218 (2 Cir. 1950), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), and, more recently, in United States v. Van Allen, 208 F.Supp. 331 (S.D.N.Y.1962), aff'd sub nom. United States v. Kelly, 349 F.2d 720, 777–779 (2 Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). See also United States v. Flynn, 216 F. 2d 354, 385–386 (2 Cir. 1954), cert. denied, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955). Granting, as Judge Tyler did, that the Jury Selection and

"the person that will be making contact with you." After a trip by Lewis, Reid and Summerill from Hong Kong in early September, they met Hopes in Los Angeles. When the heroin was delivered by the couriers and their fees paid, Hopes left, saying he had "to get this junk back there because the Dog is waiting, he is about out and needs it." Before the next trip Hopes gave Jessup's telephone number to Lewis and instructed Lewis to deliver to Jessup the heroin that was being carried by Stanton. Lewis did this.

3. Thomas had been designated by Hopes as recipient of the heroin carried by Lewis on a journey in early October, 1966. Hopes told Lewis that if he ever got into Thomas' apartment, he should look at the bedroom ceiling since "it is one of the fanciest mirrors I've even seen." On arriving in New York, Lewis called Thomas, whose number Hopes had given

him. Lewis made the delivery in the bedroom of Thomas' apartment; he observed a mirror in the form of a Maltese cross directly over the bed.

4. Searches of Hopes' and Egan's apartments and Stanton's and Bennett's homes in Sydney, Australia, during January, 1967, turned up a large amount of evidence, including the telephone numbers of Jessup and Haywood [Hopes]; the names and telephone numbers of Jessup, Stanton and Joyce Hoffman, Thomas' girl friend who was found in his apartment on the night of his arrest [Bennett]; an address book containing the names and phone numbers of Jessup and Thomas [Egan]; and business cards bearing the names and phone numbers of Thomas, Jessup, Haywood, Egan, Bennett and Reid [Stanton].

5. Judge Tyler's opinion deals also with a challenge to the method of selecting petit juries not made here.

Service Act of 1968, 82 Stat. 53, 28 U.S.C. §§ 1861–1867, will produce more thoroughly representative juries in the Southern District of New York, we find no evidence of invidious discrimination sufficient to require invalidation of this indictment.

## II. *Evidence allegedly stemming from an independent venture by Reid*

Turning to the conduct of the trial, we shall deal first with two contentions which have as a common ground a claim that Reid's final trip was not a part of the conspiracy charged in the indictment but rather an independent venture of his own. One of these, to be discussed below, relates to a statement made considerably before the trip by Lewis to Reid concerning Jessup. The other is that it was error to admit into evidence against all the defendants the heroin seized from Reid in Honolulu and to allow the jury to hear the story of his post-arrest contacts with Egan and Harris.

 Since the heroin was real evidence, its admissibility is governed by the rule, stated in Lutwak v. United States, 344 U.S. 604, 618, 73 S.Ct. 481, 97 L.Ed. 593 (1963), that though hearsay declarations of a co-conspirator are admissible against the others only if made during and in furtherance of the conspiracy, acts relevant to prove the conspiracy are admissible even if they occurred after the conspiracy had ended. Here the jury could reasonably have inferred from proof of Reid's possession of concealed heroin on his person at the time of his passage through Customs that he either had had previous experience as a courier or had been instructed by other conspirators.

 Furthermore, the heroin would have been properly admitted even if it were necessary to show that it was taken from Reid while he was acting in furtherance of the conspiracy. It is common ground that in conspiracy the agreement itself is the crime, and that "it is therefore essential to determine what kind of agreement or understanding existed as to each defendant." United States v. Borelli, 336 F.2d 376, 384, and 385 (2 Cir. 1964), cert. denied, Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), quoting United States v. Peoni, 100 F.2d 401, 403 (2 Cir. 1938). On this theory the heroin would have been admissible against a given defendant only insofar as it might reasonably have been generated by the operation of the conspiracy as he understood it. The agreement here was a broad one for the procurement of cheap heroin in Hong Kong, its transportation to the United States, its sale at a profit in this country, and a division of the spoils among the participants. Certainly at the time of Reid's last trip his actions were within the agreement as understood by the New York distributors, Jessup, Thomas, and Haywood—the very appellants who press the point. They expected heroin from Hong Kong, and Reid was bringing it. The Government was not limited to proving an agreement in which everyone's role and share was carefully fixed in advance, so that the slightest alteration in the arrangements would mean that the agreed venture had terminated. Cf. United States v. Cohen, 145 F.2d 82, 87–89 (2 Cir. 1944), cert denied, 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637 (1945). We have held that a far more striking example of conspirators deciding to cheat each other does not destroy the conspiracy. United States v. Gersh, 328 F.2d 460, 462 (2 Cir.), cert. denied, Mugnola v. United States, 377 U.S. 992, 84 S.Ct. 1919, 12 L.Ed.2d 1045 (1964). The very most that could be said is that the trip was not in furtherance of the conspiracy as understood by Bennett, since it was undertaken against his express wishes, but no objection was made with sufficient specificity to preserve for him this narrow point on appeal.

 What Egan said and what Harris did after Reid's arrest were admissible under the conspiracy exception to the hearsay rule, since they were

plainly intended to further the conspiracy as most of the conspirators understood it. It makes no difference that Reid was no longer their co-conspirator, so long as they thought he was. The argument that the tapes made of these conversations, and the testimony of one of the agents who listened to them, should have been excluded as gathered in violation of the Fourth Amendment was rejected for this circuit in United States v. Kaufer, 406 F. 2d 550 (1969). While again there might have been room for a specific request for a limiting instruction by Bennett, none was made.

■ The statement concerning Jessup was made, according to Reid, around November 3, 1966, before Reid's penultimate trip, concededly a part of the conspiracy. Reid was in Hong Kong, working out arrangements with Hopes, Summerill, and Lewis (known to Reid as "Mulligan"). Reid drew Mulligan aside, recalled a previous promise to introduce him "to some of the customers in New York City," and mentioned that he "was thinking of buying some heroin from the Chinese people I know in Hong Kong, taking it to the United States and selling it myself." Mulligan then gave "a telephone number to a person named Dog." Lewis, alias Mulligan, testified to the same episode; his version was that the conversation took place in late November, after they had both returned from New York, and that Reid asked, "What about that address you were going to give me so I can go into business for myself instead of just carting for Egan, Bennett and Hopes?", whereupon Lewis gave the Dog's phone number. Jessup contends that Lewis' statement was in furtherance not of the conspiracy charged in the indictment but of a separate venture of Reid's and hence was inadmissible hearsay.

As indicated, we think this argument takes too narrow a view of the agreement charged and proved. Reid wanted the information not in order to leave the conspiracy but to enable him to continue it with some links in the chain to the exclusion of others, and Lewis, another member of the conspiracy, was passing on information gathered from his own participation that was useful to that end. Nothing in the proof indicates that Jessup placed the kind of reliance on the maintenance of a given chain of command among the Australian suppliers that would justify finding the conspiracy ended as to him when the Australians changed their relations to each other without ceasing to supply heroin through the same channels as before.

Alternatively, we believe the hearsay rule was satisfied by the fact that here the declarant, Lewis, himself testified. Assuming that Lewis' statement should be treated as an elliptical way of saying that in the course of the conspiracy he had had dealings with Jessup, a report given directly and unambiguously in other portions of Lewis' testimony, he was open to cross-examination as to the underlying facts. We fail to see why, under the circumstances, the embodiment of his experience in an earlier declaration would inhibit effective cross-examination. See Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L.Rev. 177, 192–96 (1948), reprinted in Ass'n of American Law Schools, Selected Writings on Evidence and Trial, 764, 774–77 (1950). Certainly the opportunity for cross-examination was far better than in many instances of preserved memory where admission is routine. See Morgan, The Relations between Hearsay and Preserved Memory, 40 Harv.L.Rev. 712, 719–20, 724–32 (1927), reprinted in Ass'n of American Law Schools, supra, 374, 378–79, 382–87. The testimony would clearly be admissible under the definitions of hearsay in the ALI Model Code of Evidence, Rule 503(6), and Rule 63 of the Uniform Rules of Evidence proposed by the Commissioners on Uniform State Laws. We limit our ruling to the situation here presented, where the witness' statement was made in the course of imparting information for a use desired by the

hearer; we are not approving a general practice of admitting prior consistent extra-judicial statements of a witness, such as those made to investigating officers, for the truth of the matter asserted. See United States v. De Sisto, 329 F.2d 929 (2 Cir. 1964), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964).[6]

III. *Evidence obtained in the search of Thomas' apartment*

Farris Thomas' principal points concern the extent of a search of his apartment incident to his concededly lawful arrest on March 1, 1967, and the admissibility of a letter from Egan found during the search.

■ While the record does not disclose the size of Thomas' apartment, nothing indicates that the search went beyond the bedroom where he was found in pajamas along with his girl friend Joyce Hoffman,[7] and the adjoining bathroom and closet. A loaded .38 caliber revolver was discovered in a night table by the bed and a quantity of marihuana was found in the bathroom adjoining the bedroom and underneath the mattress of the bed. Also found in the night table, a dresser drawer and a pocket of Thomas' coat, which was lying on a chair in the bedroom, were two address books containing Jessup's telephone numbers and the business card of an "Austin Burke" of Miami, Florida. Finally a letter from Egan to "Farris or Joyce" was discovered in a woman's pocketbook in the bedroom closet. The address books, card and letter were received in evidence at the trial.

We are unable to perceive how the extent of the search exceeded what was sanctioned in Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), and United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). The search in *Harris,* also conducted without a search warrant, for the purpose of finding two stolen checks, burglar tools and pens, lasted for five hours, included each room of a four room apartment, and ultimately led to a bedroom bureau drawer where the agents found and opened a sealed envelope marked "personal papers"; the envelope contained forged draft cards which were seized as contraband and admitted into evidence on the same ground. Here the search was for the instrumentalities used in a ramified narcotics conspiracy and for evidence thereof. The agents were entitled to search for narcotics, easily concealed in pockets, pocketbooks, and furniture drawers, for weapons, and also under Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L. Ed.2d 782 (1967), for evidence showing

6. We are not sure we would agree with another argument for admissibility advanced by the Government, appealing though it seems at first blush. This starts from what seems the unquestionably sound premise that when a member of a conspiracy is arrested, even after termination of the conspiracy, names and addresses found upon him or in his premises are admissible as circumstantial evidence, as in fact a card with Jessup's name and phone number, found on Reid at the time of his arrest, was received without objection here. The Government argues that since this card, very likely stemming from Lewis' statement, was properly admitted, a slip of paper written out by Lewis and given to Reid should also be; that Lewis' statement amounted to no more than that; and that the statement was therefore admissible as circumstantial evidence, whether or not it came within the conspiracy exception and quite apart from Lewis' having taken the stand. Yet the inference the jury would be expected to draw from Lewis' declaration is equivalent to that from an explicit statement, "On the basis of dealings I or others have had with Jessup, I know he is a first-rate fellow for distributing heroin." That would seem about as clear an instance of hearsay as can be imagined and would plainly be inadmissible if made by a declarant not a member of the conspiracy who was not available for cross-examination.

7. The agents noted that the bedroom ceiling had a mirror in the shape of a Maltese cross; see fn. 3.

the identity of other conspirators and Thomas' connection with them.

In overruling the holding of Gouled v. United States, 255 U.S. 298, 309, 41 S. Ct. 261, 65 L.Ed. 647 (1921), that a search may not include "mere evidence," [8] the Supreme Court in *Hayden, supra,* entered the following caveat, 387 U.S. at 302–303, 87 S.Ct. 1642, at 1648.

> The items of clothing involved in this case are not "testimonial" or "communicative" in nature, and their introduction therefore did not compel respondent to become a witness against himself in violation of the Fifth Amendment. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908. This case thus does not require that we consider whether there are items of evidential value whose very nature precludes them from being the object of a reasonable search and seizure.

Since all the fruits of the search received in evidence except the letter from Egan would have qualified as instrumentalities under pre-*Hayden* law, the caveat requires consideration only with respect to that.

■■■ The letter, dated January 29, 1967, was addressed to "Farris or Joyce." It introduced Egan's attorney and stated that the recipients could be assured of its genuineness by its mention of the name of Jodie Brown, an alias Harris had used on his ill-starred trip to buy the last installment of heroin from Reid, and also of a ride in their new Eldorado. Egan said he needed "help in getting a bondsman and some bread for legal fees and hospital expenses" since he had been "busted" and hospitalized for three weeks. He continued, "The problems that have arisen can be solved but I need to be on the outside." If Thomas couldn't

help, perhaps two friends, "the big fellow and the golfer can." Egan felt that the recipients owed him a small favor and was sure that performing it would be to their "advantage in the long run."

We find no distinction of constitutional dimensions between the seizure of Hayden's clothing and of Egan's letter. While the demise of the "mere evidence" rule may well require the development of some new restriction on allowable search and seizure in its place, we suggest with deference that an approach geared to the objective of the Fourth Amendment to secure privacy would seem more promising than one based on the testimonial character of what is seized. The latter criterion marks the boundaries of the protection accorded by the self-incrimination clause of the Fifth Amendment, as the Court noted in the passage in the *Hayden* opinion that we have quoted, as well as by the hearsay rule. The considerations relevant to such issues are different from those applicable to determining the scope of the Constitution's protection against unreasonable searches and seizures. Despite Mr. Justice Bradley's dicta in Boyd v. United States, 116 U.S. 616, 630, 633, 6 S.Ct. 524, 29 L.Ed. 746 (1886), now largely repudiated by *Hayden,* 387 U.S. at 302–307, 87 S.Ct. 1642, the Fourth Amendment does not protect broadly against the seizure of things whose compulsory production would be forbidden by the Fifth. See State v. Bisaccia, 45 N.J. 504, 509, 213 A.2d 185 (1965) (Weintraub, C. J.). The Fifth Amendment would have prohibited a subpoena requiring Thomas to produce the address books and Egan's business card, on the basis that by responding he would be giving testimony that "the articles produced are the ones demanded," 8 Wigmore, Evidence § 2264 at 379–380 (McNaughton rev. 1961); yet no one could have seri-

---

8. While the search in *Gouled* was pursuant to a warrant, United States v. Lefkowitz, 285 U.S. 452, 465–466, 52 S.Ct. 420, 76 L.Ed. 877 (1932), extended the "mere evidence" rule to a search of premises incident to a lawful arrest. On the other hand the rule was not applied

to a search of the person incident to such an arrest. See Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Schmerber v. California, 384 U.S. 757, 769–770, 86 S.Ct. 1826 (1966).

ously asserted, even before *Hayden*, that the Fourth Amendment protected such papers against seizure pursuant to a search warrant or a reasonable search incident to a lawful arrest.

Judge Learned Hand wrote in United States v. Poller, 43 F.2d 911, 914 (2 Cir. 1930):

"* * * the real evil aimed at by the Fourth Amendment is the search itself, that invasion of a man's privacy which consists in rummaging about among his effects to secure evidence against him. If the search is permitted at all, perhaps it does not make so much difference what is taken away, since the officers will not be interested in what does not incriminate, and there can be no sound policy in protecting what does. Nevertheless limitations upon the fruit to be gathered tend to limit the quest itself * * *."

Characterizing the last remark as the rationale most frequently suggested for the rule preventing the seizure of evidence, Warden, Md. Penitentiary v. Hayden, *supra*, 387 U.S. at 309–310, 87 S.Ct. 1642, Mr. Justice Brennan concluded that the limitations had not served the purpose for which they were intended. But Judge Hand's preceding statements afford the best clue to the formulation of any new limitation that we have been able to conceive. As he observed, the vice lies in the unlimited search. The reason why we shrink from allowing a personal diary to be the object of a search is that the entire diary must be read to discover whether there are incriminating entries; most of us would feel rather differently with respect to a "diary" whose cover page bore the title "Robberies I Have Performed." Similarly the abhorrence generally felt with respect to "rummaging" through the contents of a desk to find an incriminating letter would not exist in the same measure if the letter were lying in plain view. The *Hayden*

opinion stated that "in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." 387 U.S. at 307, 87 S.Ct. 1642 at 1650. Elaboration by the Court of that pregnant remark may afford whatever new boundary the death of *Gouled* may demand.

The facts of this case do not require us to essay, even in the tentative way to which we are limited, the task the Supreme Court left for the future in *Hayden*. Here there was no "rummaging" through private papers; the letter was discovered in a lawful search of Joyce Hoffman's pocketbook for narcotics. Having found the letter in the course of a lawful search, the agents would have been entitled, even under pre-*Hayden* law, to read it to see whether it was an "instrumentality" for effecting the conspiracy—as it would have been if Egan had outlined ways by which Thomas and his girl friend could have continued the enterprise while Egan's troubles persisted. The clear import of *Hayden* is to abolish any distinction because the letter turned out to be "mere evidence" of a conspiracy rather than a proposal to continue it. To hold that seizure of Egan's letter was impermissible would elevate the caveat in *Hayden* above the holding.[9]

■ The final question is whether admission of the letter offended the hearsay rule. Thomas' counsel first objected to its receipt solely on the ground that, having been found in Joyce's pocketbook, it had "no probative value, no materiality with respect to Mr. Thomas." This was overruled. Later, after the letter had been read to the jury, a colloquy took place at side-bar. Thomas' counsel there objected on the ground that since the letter was written from jail, it was not "in furtherance of a conspiracy at large." The judge said he would receive the letter only against Thomas for the purpose of

9. Fleshing out the caveat in *Hayden* must also take account of the statement in Katz v. United States, 389 U.S. 347, 354–357, 88 S.Ct. 507, 19 L.Ed.2d 516 (1967), authorizing warrants for limited surveillance of telephone communications. Such communications often would be "testimonial" and would include nonincriminating material.

showing his prior relationship with Egan, and proceeded to give a limiting instruction with respect to the person but not the purpose. No further exception was taken.

If sufficiently specific objection had been registered, a question of some difficulty would have been presented. The letter seems plainly enough to be an assertion by Egan of past criminal association with Farris Thomas and Joyce Hoffman. For reasons indicated in fn. 6, we are not at all sure that the hearsay nature of such an assertion can be overcome simply by characterizing the evidence as "circumstantial." On the other hand, if Thomas had given help to Egan as requested, the letter would have been admissible against him on the ground, among others, that his performance of the acts requested was an admission of the letter's contents. Arguably the retention of the letter for a month and the subsequent discovery of it in Miss Hoffman's handbag go far enough down the same road, see 4 Wigmore, Evidence § 1073 at 90–91 (3d ed. 1940); McCormick, Evidence § 247 at 531–532; cf. United States v. Becker, 62 F.2d 1007, 1009 (2 Cir. 1933). Certainly these circumstances dispel what would otherwise be legitimate fears with respect to the danger of a plant.

We find it unnecessary to decide this. The original objection was without basis, and "a specific objection *overruled* will be effective to the extent of the grounds specified, and no further." 1 Wigmore, Evidence § 18 at 339 (3d ed. 1940). While the later objection at side-bar came close to presenting the real point, the judge was warranted in believing that counsel was satisfied with the limiting instruction he proposed; if counsel objected to that or to the short-fall of the instruction as given, he should have said so. Our discussion of admissibility at least suffices to show there was not "plain error" in receiving the letter, F.R. Cr.P. 52(b), which, indeed, was largely cumulative, see fns. 3 and 7.

IV. *The identification of Haywood*

 Haywood's main contention relates to his pre-trial identification by Summerill.

In his direct testimony Summerill gave the account summarized in fn. 1 and made a court-room identification of "Caroline." Cross-examination brought out grand jury testimony by Summerill that an Assistant United States Attorney had showed him. "several pictures of Negroes" from which he selected one as Caroline. When defense counsel indicated an intention to pursue the matter, the prosecutor requested a side-bar conference and warned "that the picture which the witness identified from several others is a mug shot and * * *." Defense counsel interrupted to say he didn't know that and appreciated having been told. Apparently the photographs were shown to the judge who stated, outside the hearing of the jury, that, reading from left to right, these were Bennett, Haywood, Stanton, Harris, Jessup and Thomas. Defense counsel said that under these circumstances he would not introduce the photographs, and the matter was dropped. Haywood argues that the identification as a result of the exhibition of only six photographs violated the due process standard laid down in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed. 1247 (1968), and that the procedure followed by the prosecution deprived him of the right to the assistance of counsel guaranteed by the Sixth Amendment. We find both contentions unsustainable.

The Court held in *Simmons*, 390 U.S. at 384, 88 S.Ct. 967, at 971, "that each case must be considered on its own facts, and that convictions based on eye-witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." The record is inadequate for us to make such a finding here. We know only that Summerill was

shown photographs of six men, four of them Negroes, and that Haywood's photograph was a mug shot. The latter point might be of considerable consequence if Haywood's was the only mug shot but the record does not tell us that. While counsel understandably did not wish to develop this fact before the jury, there was nothing to prevent making an adequate record at side-bar or interrogating Summerill outside the presence of the jury. See United States v. Davis, 399 F.2d 948, 950 (2 Cir. 1968). Moreover this was by no means a case where proof of a defendant's participation rested wholly on identification, see fns. 1 & 4.

The Sixth Amendment directs that "In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defense." There is every reason to think this was intended only to reject the then rule in England whereby defendants charged with felonies other than treason could not have the aid of retained counsel at their trials with respect to issues of fact, see Beaney, Right to Counsel 8–12, 22–30 (1953). However, a broad consensus has developed that, as stated in Gideon v. Wainwright, 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963), which made binding on the states the rule that Johnson v. Zerbst, 304 U.S. 458, 463, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), had applied to the United States, "in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." Haywood's argument raises a question how far the guarantee of the "Assistance of Counsel for his defense" in "all criminal prosecutions" applies before a prospective defendant is "haled into court."

The high watermarks of such an expansion of the Sixth Amendment have been Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), dealing with interrogation, and the lineup trilogy, United States v. Wade, *supra,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).[10] Although in all four cases the defendant had been indicted or arraigned and either had counsel or had manifested an intention to get one, both *Wade* and *Stovall* contain expressions indicating that "confrontation" at a line-up, even before arraignment or indictment, is a "critical stage" in a prosecution, requiring that an opportunity for the assistance of counsel be afforded. See *Wade,* 388 U.S. at 227, 228, 229–230, 236–237, 87 S.Ct. 1926; *Stovall,* 388 U.S. at 298, 87 S.Ct. 1967. Haywood argues that the reasons given in *Wade* for insisting on counsel at a line-up, namely, that eyewitness identifications are inherently untrustworthy, that the police may suggest whom the witness should pick, and that it may be hard later to reconstruct what actually happened, apply in equal or even greater measure to an exhibition of photographs which the accused has not even seen. See United States v. Marson, 644 F.2d 408 (4 Cir. 1968) (concurring and dissenting opinion of Judge Winter); Comment, Criminal Procedure—Photo Identifications, 43 N.Y.U.L.Rev. 1019 (1968); Lawyers and Lineups, 77 Yale L.J. 390 (1967).

Against this, to require that defense counsel be allowed or appointed to attend out-of-court proceedings where the defendant himself is not present would press the Sixth Amendment beyond any previous boundary. None of the classical analyses of the assistance to be given by counsel, Justice Sutherland's in Powell v. Alabama, 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932), and Justice

---

10. We have omitted Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), in light of the explanation in Miranda v. Arizona, 384 U.S. 436, 465–466, 86 S.Ct. 1602, 1623, 16 L.Ed.2d 694 (1966), that the denial of Escobedo's request for the assistance of counsel was not necessarily a violation of the Sixth Amendment as such but "heightened his dilemma, and thus made his later statements the product of this compulsion" in violation of the Fifth.

Black's in Johnson v. Zerbst, *supra,* 304 U.S. at 462–463, 58 S.Ct. 1019, and Gideon v. Wainwright, *supra,* 372 U.S. at 344–345, 83 S.Ct. 792, suggests that counsel must be present when the prosecution is interrogating witnesses in the defendant's absence even when, as here, the defendant is under arrest; counsel is rather to be provided to prevent the defendant himself from falling into traps devised by a lawyer on the other side and to see to it that all available defenses are proffered. Many other aspects of the prosecution's interviews with a victim or a witness to a crime afford just as much opportunity for undue suggestion as the display of photographs; so, too, do the defense's interviews, notably with alibi witnesses. Although in *Simmons* the Court noted that the right to counsel was not involved, since the photographs were shown to the witnesses before any arrests had been made, Mr. Justice Harlan's opinion contains language bearing on this problem, 390 U.S. at 384, 88 S.Ct. 967, at 971:

> Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement.

And in *Wade* itself, the Court listed as one of the ways the prosecution might attempt to show that a witness' identification of defendant at trial was not the fruit of a lineup held in the absence of counsel a showing of "the identification by picture of the defendant prior to the lineup," 388 U.S. at 241, 87 S.Ct. 1926, at 1940, which clearly implies that such identifications are permissible even when defendant's counsel is not present. Since we thus refuse to project United States v. Wade and its siblings into new ground, see McGee v. United States, 402 F.2d 434, 436 (10 Cir. 1968), we have no occasion to consider the effect or validity of 18 U.S.C. § 3502, added by § 701 of the Crime Control Act of 1968.

## VI. *Other claims*

We can dispose of appellants' other claims more briefly.

 The contention that the indictment should be dismissed because based on hearsay is wholly lacking in merit. All the appellants save Haywood were first charged in a superseding indictment filed March 17, 1967. This was based largely on the testimony of Narcotics Agent Matuozzi who had interviewed Lewis in Australia; it is not contended that he failed to make the source of his information clear. Lewis, Bennett and Summerill were later brought here from Australia, and Lewis and Summerill decided to cooperate. On the basis of Summerill's testimony the same grand jury that had returned the two previous indictments filed a further superseding indictment adding Haywood. The claim is that Lewis also should have been called.

None of our opinions on this subject, whether in majority or in dissent, has ever intimated or, in light of Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), permissibly could intimate, that hearsay evidence can never be a basis for an indictment. We have criticized "excessive use of hearsay" and have said that hearsay "should only be used when direct testimony is unavailable or when it is demonstrably inconvenient to summon witnesses able to testify to facts from personal knowledge," United States v. Umans, 368 F.2d 725, 730 (2 Cir. 1966), cert. dismissed as improvidently granted, 389 U.S. 80, 88 S.Ct. 253,

19 L.Ed.2d 255 (1967). See United States v. Arcuri, 405 F.2d 691 (2 Cir. 1968) and cases there cited. Here it was impossible to have Lewis testify at the time of the first superseding indictment, and no purpose would have been served by requiring the grand jurors who already had lawfully indicted the other defendants to hear him repeat Matuozzi's version, when the sole purpose of the second superseding indictment was to add a defendant whose guilt was indicated primarily by the testimony of Summerill.

 Jessup complains of the court's refusal to allow his counsel, Mr. Solomon, who had been retained shortly before trial to raise at trial the legality of the search incident to Jessup's arrest. Jessup had been represented by competent counsel before Mr. Solomon's retainer and the judge's ruling was wholly appropriate in light of the important policy of F.R.Cr.P. 41(e) of avoiding the serious inconvenience to jurors from unnecessary disruptions of trial to deal with issues that could and should have been raised in advance. See United States v. Volkell, 251 F.2d 333, 336 (2 Cir. 1958), and cases there cited.

In the cross-examination of Lewis, defense counsel, after having brought out that he had been released on his own recognizance and was working, asked where. The court interjected, "Don't give any addresses, just explain the type of work." Lewis said he worked "in a plant" but didn't wish to say what kind. When he was asked "Why not?", the prosecution objected and a conference at side-bar let to the judge's saying that Lewis might give "a general idea." He answered "a manufacturing plant." There the matter was dropped.

 We decline to sustain the claim that this was reversible error under Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). There the witness, apparently a local resident, conceded he was testifying under a false name but the court sustained prosecution objections to questions seeking to elicit what his real name was and where he lived. The Supreme Court held this to be a denial of the Sixth Amendment right to confrontation since "The witness' name and address open countless avenues of in-court examination and out-of-court investigation." 390 U.S. at 131, 88 S.Ct. 748 at 750. Here Lewis was testifying under his right name; he was asked not where he lived but where he worked; and the place where information about him could best be obtained was not at his temporary seat of employment in the United States but at his home in Australia. Moreover, so far as we can see, defense counsel accepted the judge's solution. If they had a particularized need for the name and address of Lewis' employer they should have explained this so that the judge could weigh these requirements against danger to the witness.

Appellants' point as to the charge on reasonable doubt is disposed of by United States v. Baratta, 397 F.2d 215, 227 (2 Cir.), cert. denied 393 U.S. 939, 89 S.Ct. 293, 21 L.Ed.2d 276 (1968). Their attack on the constitutional validity of the inference of knowledge of illegal importation permitted by 21 U.S.C. § 174 has been rejected by us so often as to render citation unnecessary; whatever the decision in Leary v. United States, 383 F.2d 851, 868–870 (5 Cir. 1967), cert. granted, 392 U.S. 903, 88 S.Ct. 2058, 20 L.Ed.2d 1362 (1968), concerning the similar inference permitted as to marihuana, 21 U.S.C. § 176(a), may be, see also United States v. Adams, 293 F.Supp. 776 (S.D.N.Y.1968), it would not affect these rulings. The court's instructions carefully avoided the pitfalls we have had occasion to note with some such charges in the past.

Still other points raised are so completely without basis as not to warrant lengthening this opinion further. Appellants received a fair trial; the facts proved against them made the verdict inevitable.

Affirmed.