**UNITED STATES of America ex rel. Joseph CUMMINGS, Petitioner,**

v.

**John L. ZELKER, Warden, Green Haven Prison, Stormville, New York, Respondent.**

No. 71–C–169.

United States District Court, E. D. New York.

April 30, 1971.

Joseph Cummings, petitioner pro se.

Louis J. Lefkowitz, Atty. Gen. of New York, for respondent; Brenda Soloff, Asst. Atty. Gen., of counsel.

BARTELS, District Judge.

Petitioner Joseph Cummings, presently incarcerated in Green Haven Prison, Stormville, New York, upon conviction, after a jury trial, of the crime of burglary in the third degree, seeks his release through federal *habeas corpus*. He was sentenced in the County Court, Nassau County, to a maximum term of seven years imprisonment. Petitioner contends his constitutional rights were violated because (1) an in-court identification of him was fatally infected by two prior improper out-of-court identifications, (2) the prosecutor did not forewarn him of the intended use of an incriminatory statement allegedly made by him, (3) upon arrest he was not properly informed of his right to counsel, was not given an opportunity to obtain counsel, and oral statements used against him were inconsistent and not proved to have been actually made, and (4) a defense motion to declare a mistrial during the selection of the jury was improperly denied. We find these contentions to be without merit and thus deny the petition.

Prior to trial, petitioner was afforded a combination *Wade* and *Huntley* hearing at which most of these claims were considered. The testimony adduced at the hearing and the trial relevant to the claims may be summarized as follows.

On October 24, 1968, at about 2 P.M. Cecilia E. Camardella returned from a shopping trip. Upon her arrival she heard her telephone ringing, picked it up and simultaneously looked through her outside window. Through the window she saw, in her backyard, a tall, thin, young, white man, wearing a tan sweater with a cable stitch, who stared back at her. She dropped the phone and ran outside through the side door of the house. While outside she observed a darkhaired, stocky, white male run out through the open front door of her house. Immediately thereafter Mrs. Camardella communicated these facts to the police, who began searching for the two men. Approximately fifteen minutes later, while cruising about a mile and a half north to northeast of Mrs. Camardella's home, Patrolman Vincent M. Kelly, Jr. of the Port Washington Police Department spied two men who matched the radioed descriptions trotting along the east side of the Long Island Railroad tracks. Upon seeing the police car the two men doubled their gait. After a brief chase including efforts to escape by climbing a chain link fence, both individuals were apprehended. They were placed in a radio car and returned to the scene of the crime. At the suggestion of one of the policemen, Mrs. Camardella glanced through the front window of the radio car at the two men seated in the rear of that car. Although one policeman testified that he thought another officer stated to Mrs. Camardella that there were two men in the car who could have committed the burglary, Mrs. Camardella stated that no such statement was made. Mrs. Camardella told the police that the two men looked like the burglars but were dressed differently. When she told the police that the men were dressed differently, an officer produced a tan colored sweater which Mrs. Camardella stated she recognized.

The defendants were then transported to the Sixth Precinct Station House, Roslyn. Officers Kelly, Husty, and Serroen testified that immediately upon arrival at the station house Serroen read the *Miranda* warnings to the defendants, which the defendants stated that they understood. While Serroen was informing the defendants of their rights, Mrs. Camardella, who had been asked to come to the station house, viewed both defendants through a one-way mirror. At this viewing, which took place within about one hour of the burglary, Mrs. Camardella identified both defendants as the perpetrators of the crime. After administering the *Miranda* warnings to both defendants, they were separated and Serroen began questioning Cummings. According to Kelly and Serroen, the following then transpired. Upon being informed by Serroen that he could be identified, Cummings responded that such was impossible because he had put something over his face. Cummings then directly admitted his participation in the burglary. However, when told by Serroen that the police needed a written statement, he answered that he did not wish to give such a statement in view of the possible consequences of a conviction, i. e., three to seven years for burglary or five years on the Rockefeller plan. Kelly testified that at this juncture the petitioner stated that he wanted to call an attorney or his wife, but Serroen denied that such request was ever made.

At the conclusion of the hearing Judge Spitzer ruled that evidence of the station house identification could not be adduced at trial but that he would not suppress evidence of the scene-of-the-crime identification which occurred shortly after the robbery. Most importantly, the court denied the motion to suppress any in-court identification by Mrs. Camardella, which it did upon the ground that such an identification would be the product of her observation of the defendant at the time of the crime and would not be tainted by any later identifications. Finally, the judge ruled that the state-

ments made by Cummings were voluntarily made and that they had been elicited only after the defendant had been fully accorded his *Miranda* warnings but before he had made a request for an attorney.

### Identification

■ In cases of pretrial identification postdating the decision of the Supreme Court in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the threshold question for determination is whether the procedure utilized *per se* violates the Sixth Amendment because no counsel was provided for the defendant at the time of the identification. The answer to this inquiry, with respect to the scene-of-the-crime identification occurring within thirty minutes of the burglary, is clearly no. As stated by our Court of Appeals in two cases involving scene-of-the-crime identifications, the facts of this case "are a long way indeed from *Wade*, where the FBI conducted a lineup 39 days after Wade's post-indictment arrest and 15 days after the appointment of counsel for him, without giving notice to the lawyer." United States v. Davis, 399 F.2d 948, 950–951 (2d Cir. 1968), cert. denied, 393 U.S. 987, 89 S.Ct. 465, 21 L.Ed.2d 449 (1968); United States v. Sanchez, 422 F.2d 1198 (2d Cir. 1970). Similarly, in Wade's companion cases, Gilbert v. State of California, 388 U.S. 263, 87 S. Ct. 1951, 18 L.Ed.2d 1178 (1967), and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the defendants had already pleaded guilty and securing counsel for the purpose of conducting a lineup was not onerous. In contrast, in cases involving quick scene-of-the-crime identifications, the courts have not required the elaborate procedure of carting the suspect and the victim off to the station house to await the appointment of counsel or the alternative of dismissing the suspect until a lineup attended by counsel could be arranged at some point in the future. United States v. Davis, *supra*, 399 F.2d at 951. Rather, immediate confronta-

tions, such as the one occurring in this case, have been viewed as desirable because they insure "the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh." Bates v. United States, 132 U.S.App.D.C. 36, 405 F.2d 1104, 1106 (1968); United States v. Sanchez, *supra;* United States v. Davis, *supra;* see United States ex rel. Williams v. LaVallee, 415 F.2d 643 (2d Cir. 1969), cert. denied, 397 U.S. 997, 90 S.Ct. 1139, 25 L.Ed.2d 406 (1970).

Turning to a consideration of the station house identification confronts us with a much closer question. The precise stage at which a suspect becomes entitled to an attorney cannot be ascertained with mathematical precision. Judge Friendly, writing in the *Davis* case, suggests that a clue to the dividing line may be furnished by the *Wade* court's repeated use of the term "accused" (399 F.2d at 952). Thus taking a page from Escobedo v. State of Illinois, 378 U.S. 478, 485, 84 S.Ct. 1758, 1762, 12 L.Ed.2d 977 (1964), the prophylactic presence of counsel is perhaps required when "the investigation had ceased to be a general investigation of 'an unsolved crime' " and "Petitioner had become the accused." Stating the rule, however, is often easier than applying it. Although a strong argument can be made that Cummings had indeed become the accused by the time of the station house identification, such a conclusion is not inevitable. The scene-of-the-crime identification by Mrs. Camardella consisted merely of a quick glance through the front window of the patrol car at the two suspects seated in the rear of the car. The inconclusive result of this brief encounter was that Mrs. Camardella stated that they looked like the two boys but that they were dressed differently. A number of bystanders were present in the area and it is thus understandable that a more thorough identification procedure was impractical at that time. Consequently, a more elaborate procedure was utilized approximately twenty minutes later when Mrs. Camardella viewed the two suspects through a one-way mirror, which resulted in the positive identification of Cummings. This identification procedure, conducted so quickly after the commission of the burglary, closely approximated a scene-of-the-crime identification. It clearly is calculated to have the same salutary effect of telling the police whether the suspect should be proceeded against or released so that the police may carry on the task of apprehending the guilty.

■■ However, even assuming that Cummings was entitled to an attorney at the station house or, for that matter, at the scene-of-the-crime identification, the petition must nevertheless be denied because the government has amply sustained its burden of establishing by clear and convincing evidence that the in-court identification was based upon observations of the suspect other than the questioned identifications.[1] United States v. Wade, *supra,* 388 U.S. at 240, 87 S.Ct. 1926; United States v. Ayers, 426 F.2d 524 (2d Cir. 1970), cert. denied, 400 U.S. 842, 91 S.Ct. 85, 27 L.Ed.2d 78 (1970); United States ex rel. Beyer v. Mancusi, 436 F.2d 755 (2d Cir., 1971). Mrs. Camardella testified at the *Wade* hear-

[1]. A determination that a defendant was not entitled to counsel at the time of a lineup or showup does not mean that the identification procedure utilized was necessarily a valid one. The identification may still violate due process if it were so impermissibly suggestive as to create a substantial risk of irreparable misidentification. The station house identification employed in this case is particularly vulnerable to this type of charge. However, since we find that the government has carried the heavy burden of showing that the in-court identification clearly had an independent origin, it follows *a fortiori* that the two pretrial identifications were not so conducive to irreparable misidentification that allowing the witness to make an in-court identification would be a denial of due process. Stovall v. Denno, *supra,* 388 U.S. at 301–302, 87 S.Ct. 1967; United States ex rel. Phipps v. Follette, 428 F.2d 912 (2d Cir. 1970), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970).

ing and the trial that she viewed Cummings through a window at a distance of fifteen feet. She stated that she had an unobstructed view of his face for a period of fifteen seconds and that she was not particularly nervous at the time of this confrontation. The two subsequent identifications occurred within approximately one hour of the burglary. Under the imperfect conditions of the scene-of-the-crime identification she was able to state that Cummings looked like one of the burglars even though he was wearing different clothing. The brown cable stitch sweater which she had told the police Cummings was wearing was then shown to her and she immediately identified it. Her identification of Cummings at the station house was promptly and confidently made. Moreover, Mrs. Camardella was subjected to searching cross-examination at both the *Wade* hearing and the trial but steadfastly maintained that her ability to identify Cummings stemmed from her observation of him during the course of the burglary. Throughout the proceedings she contended that it was much easier for her to identify Cummings as compared to co-defendant Redman because she had seen the former so plainly through the outside window. In these factual circumstances we are compelled to conclude that the state judge, who saw and heard the witnesses, did not err in denying petitioner's motion to suppress Mrs. Camardella's in-court identification. Although this court has made an independent review of the record in this case, it should be noted that factual findings of state tribunals, which, as in this case, are made after a full and fair hearing, are accorded presumptive validity in *habeas corpus* proceedings. 28 U.S.C. § 2254(d).

### Inculpatory Statements

■ Petitioner's first claim in this regard is that the prosecutor did not inform him that he intended to use an admission that Cummings allegedly made to the police. Cummings here refers to information he gave to the police concerning his address, which the prosecutor made reference to in his summation. This claim does not raise any constitutional question and was not even objected to at the time it was mentioned in the summation. Moreover, the record of the pretrial *Wade* and *Huntley* hearing clearly supports the state court finding that Cummings was properly afforded his *Miranda* warnings before any inculpatory statements were secured from him. Similarly, the minutes of that hearing demonstrate that petitioner did not make any request for an attorney until, at least, after he had made the incriminatory statements. Whether the statements he allegedly made were in fact made, or inconsistent, were matters for the jury to decide.

### Mistrial

■ Finally, petitioner claims that the failure of the court to declare a mistrial after the prosecution had stated during the selection of the jury that the defendants have a constitutional right to testify violated his rights under the Constitution. It seems doubtful that this unfinished remark of the prosecutor can be construed as an improper advance comment on the failure of the petitioner to take the stand. *Cf.* United States v. Cusumano, 429 F.2d 378 (2d Cir. 1970). In any event, the prompt and complete instruction by the judge to the panel of jurors that the failure of a defendant to take the stand raises no presumption at all, converts any possible error to harmless error beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

Accordingly, petitioner's application for a writ of *habeas corpus* must be and hereby is denied. So ordered.