441 F.2d 873
 UNITED STATES of America, Plaintiff-Appellee,
v.
Henry E. ESTRADA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Yolando JACOBO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John Garcia ROBLES, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Garrison SHYNE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Richard Jerez ROBLES, Defendant-Appellant.
 Nos. 25901, 25938, 25945, 25924 and 26023.
 United States Court of Appeals, Ninth Circuit.
 April 23, 1971.
 
 Luke McKissack (argued), Hollywood, Cal., Leslie A. Minkus, Palo Alto, Cal., Richard A. Walton, Hollywood, Cal., Leland Featherman, Artie G. Henderson, San Diego, Cal., for defendants-appellants.
 Phillip W. Johnson (argued), Sp. Asst. to the U.S. Atty., Robert H. Filsinger, Chief, Criminal Division Harry D. Steward, U.S. Atty., San Diego, Cal., for plaintiff-appellee.
 Before MURRAH,[1] ELY, and HUFSTEDLER, Circuit Judges.
 HUFSTEDLER, Circuit Judge:
 
 
 1
 Appellants Shyne, Estrada, Jacobo, Richard Robles, and John Robles, together with codefendants Marratto and Gonzalez, were tried under a one-count indictment charging them with conspiring from an unknown date until about February 13, 1968, to smuggle heroin and cocaine into the United States from Mexico in violation of 21 U.S.C. 173 and 174. The jury found appellants guilty as charged; mistrials of their codefendants were declared after the jury failed to reach a verdict with respect to them.
 
 
 2
 We reverse the convictions of Shyne, Estrada, and Richard Robles ('Richard') for prejudicial error in admitting over objection certain items of documentary evidence. We affirm the convictions of Jacobo and of John Robles ('John').
 
 
 3
 The Government's charges linked each of the defendants to a large scale system for smuggling and distributing narcotics. At the base of the operation were Robert and Helen Hernandez who supplied major quantities of narcotics from Tijuana, Mexico, to wholesalers and retailers in the Los Angeles area. The drugs were initially carried across the border by some unidentified women and later by a Government witness, Archibald Palma. Palma, in turn, delivered the drugs to Lannom, a narcotics wholesaler, who abandoned his calling during the course of the operation to become a Government informant. Lannom telephoned the Hernandez residence twice daily to obtain an encoded list of persons who had ordered narcotics, their telephone numbers, and the types and quantities of narcotics ordered. Thereafter he telephoned the buyers and told them where he had hidden their caches. Narcotics purchasers paid for the deliveries by sending telegrams or money orders to the Hernandezes.
 
 
 4
 The Government intercepted Palma on August 6, 1967, during one of his smuggling sorties and thereupon seized about 8 pounds of narcotics. Palma also had in his possession two safe deposit keys. A search of the box pursuant to a warrant produced an encoded list of narcotics purchasers, their phone numbers, and their orders for narcotics.
 
 
 5
 Palma decoded the telephone numbers. Records of telephone companies showed several calls placed to the Hernandez residence from the locations of the decoded phone numbers. An alias or code name appeared beside each phone number on the Palma list. Records of local utility companies identified the resident of each address from which the Hernandez calls were made. The alias 'Pelon' appeared beside a phone number located at the residence of a Rachel Robles; the name 'Richard' corresponded to a phone listed in the name of 'J. Hernandez' located at an address where a Richard Robles received electric service; the name 'Henry' appeared beside a number located at Bernice Florence's residence. Although Jacobo's name or alias did not appear on Palma's list, Palma identified her in court as a person to whom he personally had delivered 100 ounces of heroin. Palma also identified John and Marratto. He could not identify the remaining defendants.
 
 
 6
 Sometime after Palma began transporting narcotics, Lannom was convicted of a marihuana offense. In January 1968, he jumped bail and fled into Mexico where he began working for the Hernandezes in their home. Richard Wright also worked there handling telephone orders. Lannom and Wright left the narcotics trade in late December 1968, contacted federal officers, and surrendered at the boarder.
 
 
 7
 Over objection, the Government introduced money orders payable to Hernandez and veriously signed 'Gary Shyne' or 'Henry Estrada,' and one money order, similarly payable, signed 'Richard Robles.' The Government's handwriting expert could not identify the handwriting on the orders signed 'Gary Shyne.' In Estrada's case, the Government witness testified that the signature on a letter written by one Henry Estrada from the San Diego County jail to the United States Commissioner was written by the same person who signed the name 'Henry Estrada' to the questioned money orders. But there was no evidence that that person was the defendant Henry Estrada. The Government offered no evidence to prove that the defendant Henry Estrada was ever incarcerated in San Diego. No circumstantial evidence was offered to connect Estrada to the writer of the letter or to the signatory of the money orders. As to Richard Robles, the Government's expert witness had two handwriting exemplars prepared by a Richard Robles in 1958 and 1960. He testified that the same person wrote the exemplars and the signature on the money order, but there was no evidence that defendant Richard Robles wrote either the exemplars or the signature on the money order. The two exemplars bear the fingerprints of the person who prepared them, but the Government offered no evidence identifying the fingerprints.
 
 
 8
 None of these money orders was admissible, because the Government failed to lay the requisite foundation by proof of its authenticity. To lay the foundation, the Government had to introduce evidence sufficient to sustain a finding that each of the money orders was signed by the person against whom the documents were sought to be admitted. (C. McCormick, Evidence 395 (1954); 7 J. Wigmore, Evidence 2128, 2130 (3d ed. 1940).) The Government produced neither direct nor circumstantial evidence to authenticate the writings.
 
 
 9
 Error in admitting the challenged money orders was not harmless. Aside from the money orders, evidence tending to identify Richand, Estrada, and Shyne as participants in the narcotics traffic was conflicting and uncertain. Similar, although somewhat more convincing, testimony was introduced against the codefendants Marratto and Gonzalez without the offer of any money orders, the jury was unable to reach a verdict as to them, and mistrials were declared.
 
 
 10
 We turn to John's appeal. His first contention is that the court erred in denying his motion to suppress evidence claimed to be the fruit of an illegal search.
 
 
 11
 On April 10, 1968, federal narcotics agents arrived at the residence of John Robles. They were carrying an arrest warrant issued February 14, 1968. After announcing that they had a warrant for Robles' arrest and being denied entrance, the officers forced the door and made the arrest. The officers then conducted a search of the premises. In a bedroom night stand, they found a receipt for a cashier's check payable to Hernandez and a postcard addressed to John Robles that began, 'Look here Brother Pelon.' Elsewhere in the bedroom, they found a slip of paper bearing the name 'Yolie,' together with Yolando Jacobo's phone number. In a photograph album stored in a closet, they found two pictures of Lannom.
 
 
 12
 Were the rule of Chimel v. California (1969) 395 U.S. 752, 89 S.Ct. 2034, 12 L.Ed.2d 685 applicable to searches conducted before the Chimel decision, this search incident to John's arrest would have been invalid, but we have held to the contrary in Williams v. United States (9th Cir. 1969) 418 F.2d 159, cert. granted 397 U.S. 986, 90 S.Ct. 1120, 25 L.Ed.2d 394(1970). Matching this search against the per-Chimel standards of United States v. Rabinowitz (1950) 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 and Harris v. United States (1947) 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399, we hold the search valid. (See also Jack v. United States (9th Cir. 1967) 387 F.2d 471, 473-474, cert. denied 392 U.S. 934, 88 S.Ct. 2299, 20 L.Ed.2d 1393 (1968).)
 
 
 13
 He also complains that certain of the testimony of Wright concerning transactions between him and John should have been stricken because those transactions occurred after the alleged conspiracy had ended. There was no error in admitting the challenged portions of Wright's testimony, because that testimony related to a conspirator's acts tending to prove the existence of the conspiracy and, as such, the evidence was admissible against both the actor and his coconspirators even if the conspiracy had terminated at the time those acts took place. (Lutwak v. United States (1953) 344 U.S. 604, 618, 73 S.Ct. 481, 97 L.Ed. 593; United States v. Bennett (2d Cir.) 409 F.2d 888, 893, cert. denied sub nom. (1969) Haywood v. United States, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101.)
 
 
 14
 John next assigns as error the introduction of four of seven cashier's checks offered against him. A bank teller testified that John purchased three of the checks from her. The bank's records indicate that John purchased all seven checks. On two of the checks the address listed for the purchaser is the same as that of the residence where John was arrested. A receipt for one of the questioned checks was found in the search of John's home. The direct and circumstantial evidence adequately supplied the foundation for the admission of all the checks.
 
 
 15
 His final evidentiary challenge is equally unavailing. He says that there was inadequate foundation for the admission against him of telephone records relation to a telephone listed in Rachel Robles' name because there was no direct evidence that he used that telephone to place the calls to the Hernandez residence. We think the circumstantial evidence was more than adequate to identify him as the caller. Direct proof of his identity is not required (See United States v. Roselli (9th Cir. 1970) 432 F.2d 879, 896, cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971).)
 
 
 16
 We reject John's contention that the court erred in refusing to give two instructions that he had proposed. The first concerned the purpose for which the court admitted into evidence eight pounds of narcotics seized from Palma at the border. The requested charge instructed the jury that the exhibit was admitted 'for the limited purpose of corroborating the testimony of Palma that he had access to certain quantities of narcotics' because no evidence produced at trial had connected the exhibit to any defendant. The court properly refused to give this instruction. The indictment charged this particular smuggling attempt as an overt act. As an overt act in furtherance of the conspiracy, it was admissible against Palma's coconspirators. The exhibit tended to prove the occurrence of the overt act. Its effect was not limited to corroboration, nor was it applicable only to Palma.
 
 The second requested instruction stated:
 
 17
 'Proof of several and separate conspiracies involving some but not all of the defendants is not proof of the single conspiracy charged. If the government, in your opinion has failed to prove the existence of a single conspiracy, you must find each of the defendants not guilty.'
 
 
 18
 This instruction ties the defendants together into a case of all or nothing. Even if there were sufficient evidence to prove that six defendants conspired together, appellant's proposed instruction would demand a verdict of not guilty because the seventh defendant did not participate in the conspiracy, a wholly erroneous result. (See United States v. Kelly (2d Cir. 1965) 349 F.2d 720, 757-758, cert. denied (1966) 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544.)
 
 
 19
 There is no merit to John's claim that he was prejudiced by the district court's limiting the number of peremptory challenges to the prospective jurors to two per defendant. The codefendants were given an aggregate of the ten such challenges prescribed by Rule 24(b) of the Federal Rules of Criminal Procedure. The fact that all but one of the prospective jurors had had prior service on narcotics cases does not imply prejudice on the part of the jurors, nor does it support a claim that the failure of the district court to expand the number of peremptory challenges was an abuse of its discretion. (Cf. United States v. Haynes (2d Cir. 1968) 398 F.2d 980, 984-985, cert. denied (1969) 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 124; United States v. Ragland (2d Cir. 1967) 375 F.2d 471, 476 n.2, cert. denied (1968) 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987; cf. Deck v. United States (9th Cir. 1968) 395 F.2d 89, 92.)
 
 
 20
 John and Jacobo contend that the evidence was insufficient to prove the existence of a conspiracy among the several codefendants, primarily relying on Kotteakos v. United States (1946) 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. They say that there was a wheel conspiracy with the Hernandezes as the hub and the codefendants as the spokes and that here, as in Kotteakos, the Government failed to prove that the spokes were connected by a rim. We disagree. The Government presented ample evidence linking John and Jacobo to both Hernandez and each other, as well as other members of the conspiracy. The items seized in John's home tied him to Hernandez, Lannom, and Jacobo. The postcard seized there identifies Robles as the conspirator 'Pelon.' Jacobo was implicated by Lannom's and Palma's identifications and Lannom's testimony that he met her and her husband in Tijuana where they discussed the traffic in heroin. The papers seized in Jacobo's home bore the same code names and narcotics designations used by Hernandez, including the name 'Pelon.' An address book also seized in the Jacobo home contained the Hernandez address in Tijuana. This evidence is sufficient to establish beyond a reasonable doubt that Robles and Jacobo conspired together with Lannom, Palma, and Hernandez.
 
 
 21
 We next turn to Jacobo's contentions that are different from John's. Jacobo says that the Government failed to prove that each conspirator knew that the narcotics that they were purchasing had been illegally imported, relying upon Hernandez v. United States (9th Cir. 1962) 300 F.2d 114. In Hernandez, we held that a co-conspirator's possession of heroin could not be imputed to his codefendant. In order to activate the inference of knowledge of illegal importation arising from possession, the Government must prove that each conspirator actually or constructively possessed the narcotics, but we cautioned that the holding in Hernandez did not apply to those whose knowledge of illegal importaion was shown by direct or circumstantial evidence independent of the statutory inference. (300 F.2d at 124.) Here, the evidence linking Jacobo to john and Hernandez was sufficient to prove Jacobo's knowledge without reliance on the inference.
 
 
 22
 Jacobo next urges that the trial court erred by not requiring the Government to identify the informant whose information led to Palma's arrest as he crossed the border. This court has consistently held that the Government need not disclose an informant's identity in a border crossing case unless the defense shows that the circumstances necessitate disclosure. (E.g., Gaylor v. United States (9th Cir. 1970) 426 F.2d 233, 234-235; Encinas-Sierras v. United States (9th Cir. 1968) 401 F.2d 228, 231.) Jacobo has offered no more than speculation about testimony the informant might have provided; her speculations are not enough to support a conclusion that the informant would assist her in her defense. (See Lannom v. United States (9th Cir. 1967) 381 F.2d 858, 861.)
 
 
 23
 Finally, Jacobo contends that certain statements made by witnesses Lannom and Wright to Government agents should have been disclosed. The court examined those statements in camera excised those portions not relating to the testimony of Lannom and Wright, and presented defense counsel with the remainder. After a twenty-minute recess, the court asked the defense whether they wished to recall any witness for coss-examination. Appellants declined the invitation.
 
 
 24
 We have examined the excised portions and have found nothing relating to the witnesses' testimony. The remainder related to testimony that defendants had already tested by cross-examination. The court did not err by editing the statements. (See Ogden v. United States (9th Cir. 1962) 303 F.2d 724, 734-735, 738-739.)
 
 
 25
 The convictions of John Robles and Jacobo are affirmed. The three remaining convictions are reversed, and the causes remanded to the district court.
 
 
 
 [1]
 Hon. Alfred P. Murrah, Senior Circuit Judge for the Tenth Circuit, sitting by designation