**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Lonnie Melvin MURRAY, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Oliver Curtis ROBERTS, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Roosevelt WALKER, Defendant-Appellant.**

**HERNANDEZ CASES.**
**Group II Appeals.**
**Nos. 71-2088–71-2090.**

United States Court of Appeals, Ninth Circuit.

Feb. 16, 1973.

Donald S. Friedman (argued), of O'Gara & O'Gara, San Francisco, Cal., David K. Yamakawa, Jr. (argued), San Francisco, Cal., Barry Tarlow (argued), Los Angeles, Cal., for defendants-appellants.

James W. Meyers, Asst. U. S. Atty. (argued), Phillip W. Johnson, Special Asst. Atty. Gen., Harry D. Steward, U. S. Atty., San Diego, Cal., for plaintiff-appellee.

Before HAMLEY and CHOY, Circuit Judges, and SCHNACKE,* District Judge.

HAMLEY, Circuit Judge:

In our opinion filed today in the Group I appeals in the Hernandez Cases, United States v. Baxter, et al., 492 F.2d 150 (9th Cir. 1973), the general background of an extensive alleged narcotics conspiracy is set out in considerable detail. As there indicated, the district court had divided the forty-nine defendants named in a two-count indictment into three groups for trial. The Group II Hernandez appeals, under consideration in this opinion, arise from the convictions obtained in the Group II trial. The Group III Hernandez appeals, arising from the third trial under this indictment, have been disposed of in a decision filed today in United States v. Valdivia, et al., 492 F.2d 199 (9th Cir. 1973).[1]

The defendants involved in the Group II trial were Lonnie Melvin Murray, Oliver Curtis Roberts, Roosevelt Walker, Gerald Wilson Frunzi, Martha Catarino, Willie Lauderdale, Manuel Campuzano, Michael (aka Lefaun Leon) Hughes, John Payne and Shirley Ann Conrad. The two-count indictment, charging a conspiracy and a substantive offense, is described at the outset of the Group I opinion. All ten Group II defendants were named in both the conspiracy and the substantive counts.

Defendant Hughes changed his plea during the trial, and the cases of defendants Payne and Conrad were severed for separate trials. Defendant Lauderdale's motion for judgment of acquittal was granted, and defendant Campuzano's like motion was granted as to count two. The jury found defendant Campuzano not guilty on count one. The jury found defendants Murray, Roberts, Walker, Frunzi and Catarino guilty as charged. All five appealed, but on the motions of Frunzi and Catarino, their appeals have been dismissed.

The result is that, of the Group II defendants, only Murray, Roberts and Walker are before us in the Group II appeals. While each has filed separate briefs, we have consolidated the three appeals for disposition in this court.

In the Group II appeals, one or more of the defendants have advanced arguments which were also advanced, and rejected, in the Group I appeals. These arguments are: (1) the documents taken from the Hernandez home in Mexico

---

* The Honorable Robert H. Schnacke, United States District Judge for the Northern District of California, sitting by designation.

1. As stated in note 2 in the Group I opinion, another indictment involving alleged similar narcotics transactions, led to convictions which are before this court in what has been labeled the Group IV Hernandez appeals. Our decision therein, filed today, is reported in United States v. Mickens, 492 F.2d 211 (9th Cir. 1973).

were inadmissible in evidence for various reasons (see discussion in section II of Group I opinion), and (2) certain telephone records were wrongfully obtained and used by the Government (see discussion in section III of Group I opinion). For the reasons stated in the Group I opinion, we hold these contentions to be without merit.

### I. *Proof of Conspiracy and Severance for Trial.*

Defendants Murray and Roberts contend, in effect, that the evidence is insufficient to establish that they participated in a single over-all conspiracy of the kind charged in the indictment and that if the Government proved that either of them participated in one of several more limited conspiracies, such defendant was prejudiced by having that issue tried in the context of an over-all conspiracy. Murray also raises the related argument that, by reason of the likelihood of such prejudice, the trial court erred in denying his timely motion for a severance and separate trial.

At the outset of section I of our opinion in the Group I appeals, United States v. Baxter, et al., 492 F.2d 150 (9th Cir. 1973), filed today, we discussed the general considerations to be borne in mind in dealing with challenges to the sufficiency of the evidence to support conspiracy charges. What we there said is equally applicable here, and, in addition, we note that the evidence introduced at this trial pertaining to the background facts of the single over-all conspiracy, is essentially the same as that introduced in the Group I trial, as summarized in the *Baxter* opinion. We therefore proceed at once to an examination of the record pertaining to the proof of conspiracy in the case of defendants Murray and Roberts.

*Defendant Murray.* Under the evidence considered in the light most favorable to the Government, the following factual pattern appears: The Hernandez "customer book" contains a page which is headed "(RAPHEAL)," under which reference is made to "Lonnie," with his telephone number and a number for "Brenda—Wife." This page also states the price per ounce "Lonnie" was to pay for heroin and cocaine.

The "customer book" showed Lonnie's purchases to have aggregated one and one-half pounds of heroin and cocaine, which would have cost him eight thousand six hundred dollars. He paid an additional eight thousand dollars on December 12, 1968, for fifteen ounces of heroin and seven of cocaine.

One of the telephone numbers shown in the "customer book" (751–6880) was actually that of W. E. Lauderdale in Los Angeles. When defendant Willie Lauderdale was arrested at his home in Los Angeles, two pieces of paper found in his bedroom contained Murray's name. A photograph of Murray was found upright on the dresser in Lauderdale's residence.

The telephone bills for Murray's own residence in San Francisco, which was under the name "Elliott Avant," showed forty-seven calls to the Lauderdale telephone, nine calls to the Brenda Martin telephone, nine calls to the Robert and Helen Hernandez home in Tijuana, and two calls to the Juan Hernandez telephone in Tijuana. Exhibit 511, a handwritten telephone book found at Murray's residence, contains the name "Hellen," with the Tijuana telephone number of Robert and Helen Hernandez.

There was direct or circumstantial evidence showing that Murray was in contact with Helen Hernandez, Cohn (the Hernandezes' distributor), Juan Hernandez and Wright. On April 2, 1968, approximately ninety-one grams of heroin were found in a garment bag in Murray's possession at the San Francisco International Airport.

Murray contends that his photograph, exhibit 546, found on Lauderdale's dresser, has no probative value because Lauderdale was acquitted by the court. We do not know what deficiencies in evidence, or other circumstances, caused the trial court to acquit Lauderdale. But the photograph does have pro-

bative value insofar as Murray is concerned, because it tends to show that the "Lonnie" referred to in the Hernandezes' "customer book" in connection with the key telephone number at the Lauderdale residence, is defendant Murray.

Murray has advanced a variety of arguments pertaining to particular items of evidence which, together, depict the relationship described above. We have examined each of these contentions but find that they are either without merit or are inconsequential.

█ Having in view the background evidence regarding the over-all conspiracy, and that which relates specifically to Murray, as reviewed above, we believe the jury could reasonably find that Murray must have known that other retailers, in addition to himself, were involved with the Hernandez organization in a broad project for the smuggling, distribution and retail sale of narcotics. The jury could also reasonably find that Murray must have realized that the benefits he and the other retailers derived from the operation were dependent upon their mutual participation therein. These basic findings are ample to support the jury determination that Murray, in effect, agreed to participate in the over-all scheme, and did participate therein. *See* Blumenthal v. United States, 332 U.S. 539, 557, 558, 68 S.Ct. 248, 92 L.Ed. 154 (1947); United States v. Friedman, 445 F.2d 1076, 1080 (9th Cir. 1971); Daily v. United States, 282 F.2d 818, 820 (9th Cir. 1960).

█ We therefore hold the evidence sufficient to establish the existence of the over-all narcotics conspiracy, as charged, and Murray's participation therein. Moreover, as to Murray, since there was no variance between the indictment and the proof, there was no abuse of discretion in refusing to sever Murray's trial.

*Defendant Roberts.* Under the evidence considered in the light most favorable to the Government, the jury could have found the facts to be as follows:

A page of the Hernandez "customer book" is headed

"Dumpso—brings money 300–S
737–3162 DMD-MTFI 550–C
 Cash"

According to the testimony this meant that the customer "Dumpso" could be reached at telephone number 737–3162 and that he paid three hundred dollars per ounce for heroin and five-hundred fifty dollars per ounce for cocaine. Exhibit 401 shows "Dumpso's" purchases of five pounds of narcotics in one and one-half months, at a total sales price of thirty-two thousand fifty dollars. Two witnesses testified that Roberts was known to them as "Dumpso."

Lannom delivered narcotics from the Hernandezes to Roberts in Los Angeles during 1966. In about September of 1968, defendant John Payne delivered two packages to Lannom and told Lannom that "Dumpso" was "doing fine." On October 17, 1968, Wright, one of the leading figures in the Hernandez operation, met with Payne who gave Wright thirteen thousand one hundred dollars. At this meeting, Payne told Wright that twelve thousand dollars of this amount was from "Dumpso," and twelve thousand dollars was credited to "Dumpso's" account in the "customer book."

Roberts admitted that he had known defendant Walker for approximately twenty years and that they had called each other on the telephone between San Francisco and Los Angeles. When Walker was arrested at his residence, a notation of a telephone number listed to Roberts was found. Roberts also admitted that he met codefendant Payne in Los Angeles and that he had talked to Payne by telephone. When Payne was arrested, a piece of paper was found containing, in Roberts' handwriting, Roberts' name and telephone number.

The "customer book" shows a relationship between Roberts and codefendant Gerald Wilson Frunzi. Under the name "Ed Johnson," Frunzi registered at the Hacienda Motel, a frequent situs for narcotics deliveries, on the same dates

that narcotics were delivered to Roberts and to defendant Walker.

The telephone number in the Hernandez "customer book" (737–3162), referred to above, was listed to "Otis White" in Los Angeles. A bill for this telephone shows long distance calls to John Payne's telephone, to two of the telephone numbers given by Roberts to Payne, and to Roberts' own telephone. Alma Finley testified that defendant Roberts had been a guest at her residence, that he stayed overnight from time to time in a guest room, and that there was an extension telephone in the guest room from a telephone belonging to "Otis White." Although Roberts denied making any long distance calls, he admitted that he knew "Otis White," that he had stayed overnight at the Finley residence about two times in 1968, and that he had used the telephone during his stay there.

As in the case of defendant Murray, we believe the general background evidence concerning the nature of the over-all conspiracy, and that which pertains specifically to Roberts, as reviewed above, warranted the jury in finding that Roberts knowingly associated himself with what he must have realized was a general conspiracy to smuggle, distribute and retail narcotic drugs. Accordingly, the evidence was ample to sustain the jury finding as to the existence of the over-all narcotics conspiracy and Roberts' participation therein.

## II. Proof of Substantive Count

In count two of the indictment the grand jury charged that on or about December 1, 1968, all of the defendants, including the three involved in this appeal, knowingly used telephone, wire and other means of communication in San Diego County, in facilitating the commission of, and attempting to commit the importation, concealment, and sale of heroin and cocaine, narcotic drugs, the penalty for which offenses is provided in 21 U.S.C. § 174, in violation of 18 U.S.C. § 1403(a).[2] As before noted, defendants Murray, Roberts and Walker were convicted on this charge as well as on the conspiracy count.[3]

■ Roberts and Walker contend that the evidence is insufficient to support their conviction on count two. Under the concurrent sentence doctrine we could, in the exercise of our discretion, decline to reach this issue. See Benton v. Maryland, 395 U.S. 784, 791, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

However, we have elected to consider this question. San Diego County facilities were necessarily used for any telephone calls from California to Tijuana, and for sending Western Union money orders from California to Tijuana. But no direct evidence of calls made, or money orders sent, by Roberts or Walker to Tijuana was introduced. There was testimony that Richard Wright received narcotics orders by telephone, but there was no evidence showing that this was the way Roberts or Walker placed their orders.

■ The Government contends that an agent's acts may be imputed to his principal, citing Murray v. United States, 403 F.2d 694, 696 (9th Cir. 1968). Roy Cohn and John Payne, the Government argues, were the agents of Walker and Roberts, and tape recordings of telephone calls by Payne and Cohn to Richard Wright in Tijuana were introduced in evidence. However, the court in *Murray* indicated that the require-

---

2. 18 U.S.C. § 1403 and 21 U.S.C. § 174 were repealed, effective May 1, 1971. Pub.L. 91–513, Title III, § 1101(a)(2) (4) and (b)(1)(A), 84 Stat. 1292 (1970). Section 1103(a) of Pub.L. 91–513 contains a savings clause covering any prosecutions commenced prior to May 1, 1971. 84 Stat. 1294 (1970). This prosecution was commenced February 5, 1969.

3. Roberts was sentenced to serve ten years on count one and two years on count two, to run concurrently. Walker was sentenced to serve fifteen years on count one and two years on count two, to run concurrently.

ments for finding an agent-principal relationship in a criminal case are stringent. In this case, there is no evidence showing that Roberts or Walker knew that these calls were made, or that these particular calls had any connection with their particular narcotics transactions. The evidence is insufficient to support the proposition that Cohn and Payne were the agents of Walker and Roberts at the time the calls to Tijuana were made.

■■ Although the Government does not raise the point, each conspirator is responsible for the acts of his co-conspirators committed pursuant to and in furtherance of the conspiracy. Pinkerton v. United States, 328 U.S. 640, 646–647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). This is true even if one is not aware of the performance of those acts or the existence of the actors. United States v. Roselli, 432 F.2d 879–894 (9th Cir. 1970). However, the jury must be instructed on the *Pinkerton* theory of criminal liability if a conviction on that theory is to be sustained. *Id.* at 895, n. 26. No such instruction was given in this case.

We hold that the evidence is insufficient to support the conviction of Roberts and Walker on count two of the indictment.

III. *Searches and Seizures*

Murray and Walker argue that evidence received at the trial was obtained as a result of certain unlawful searches and seizures.

Defendant Murray's first allegation of error concerns the heroin seized from him at the San Francisco International Airport on April 2, 1968. Murray's motion to suppress the heroin on the ground that it was obtained during an illegal search and seizure was denied.

During the hearing on the motion to suppress, the deputy sheriff who conducted the search testified as follows: At approximately 2:00 a.m. on the morning of April 2nd, he received a telephone call at the Hilton Inn, near the airport, from the desk officer at the sheriff's office. The desk officer told him that information had been received from the Los Angeles Police Department concerning a man who was to arrive at the airport by plane from Los Angeles. The deputy was given a detailed description of the suspect and was informed as to the time of arrival, the airline on which the suspect was to arrive, and that the suspect was carrying a garment bag in which narcotics would be found. After proceeding to the airport, the deputy received another call from the desk officer and was told that the suspect's name was Lonnie Melvin Murray.

■ When the deputy sheriff arrived at that part of the airport at which Murray's flight was unloading, he recognized Murray as matching the desk officer's description. Murray was carrying a garment bag. Two other officers arrived. After confronting Murray, the officers took him to the airport operations office. The deputy asked Murray if he could search him, and Murray consented. The garment bag was searched following a request for Murray's consent, and heroin was found.[4] Murray was then advised that he was under arrest.

Murray contends that the heroin should have been suppressed because there was no probable cause for the search. The Government's theory is that this was a search incident to a lawful arrest. Neither a search warrant nor an arrest warrant was obtained. Thus the search and seizure was valid only if it was incident to a valid arrest

---

4. Even assuming that there is evidence indicating that Murray told officers they could search his garment bag, this would not validate an otherwise invalid search of that bag in view of the absence of any showing that Murray had been told he had the right to refuse consent. Bustamonte v. Schneckloth, 448 F.2d 699, 700 (9th Cir. 1971), cert. granted, 405 U.S. 953, 92 S.Ct. 1168, 31 L.Ed.2d 230 (1972).

and if the scope of the search did not exceed that which was, at the time, permissible as incident to a valid arrest.

■ While Murray was not advised that he was under arrest until after the search and seizure, we think he was actually placed under arrest when the officers took him to the airport operations office, about fifty yards from where the officers encountered him. The testifying officer indicated that he would not have let Murray leave. *See* United States v. Williams, 351 F.2d 475, 478 (6th Cir. 1965). In any event, a search immediately preceding an arrest is incident thereto if probable cause for the arrest existed prior to the search. *See* Fernandez v. United States, 321 F.2d 283, 287, n. 8 (9th Cir. 1963); Busby v. United States, 296 F.2d 328, 332 (9th Cir. 1961).

■ The officers were entitled to take Murray into custody and make the search in question if (1) the additional information acquired by the arresting officer in some sense corroborated the Los Angeles police report that Murray had committed a felony, or was in the process of committing a felony, or (2) the Government proved that the Los Angeles police had probable cause to arrest Murray for a felony. *See* Whiteley v. Warden, 401 U.S. 560, 567–568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

■ The Government made no effort to prove the second of these alternatives. But the Government did prove that the arresting officer, prior to making the search, obtained additional information which, in some sense, corroborated the Los Angeles police report that Murray was in the process of committing the felony of transporting heroin. That additional information was remarkably similar to that which was found sufficient in Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).[5]

In *Draper*, the arresting officer noted that the man precisely fit the description supplied by the informant, even to the carrying of a tan zipper bag. The *Draper* opinion comments as follows on this circumstance:

> "And surely, with every other bit of Hereford's [the informant's] information being thus personally verified, Marsh [the officer] had 'reasonable grounds' to believe that the remaining unverified bit of Hereford's information—that Draper would have the heroin with him—was likewise true." 358 U.S. at 313, 79 S.Ct. at 333.

The description of Murray, his time of arrival, the airline on which he was to arrive, and the garment bag are even more detailed than the description in *Draper*. The deputy sheriff testified that these descriptions all matched his personal observations. Applying the principles referred to above, we hold that the district court did not err in finding probable cause for the arrest at the airport.

■ The search of the garment bag was made incident to that arrest. Murray does not appear to argue that the search of the garment bag exceeded the permissible scope of a search incident to his arrest. In any event, we think the scope of the search incident to the arrest was permissible. *See* United States v. Maynard, 439 F.2d 1086 (9th Cir. 1971); United States v. Mehciz, 437 F.2d 145, 147 (9th Cir. 1971). While these cases were decided prior to the decision in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), which involved the search of an automobile, we find nothing in that

---

5. *Whiteley* in no sense overruled or undermined *Draper*. At 401 U.S. 567, 91 S.Ct. at 1036, in fact, the *Whiteley* Court specifically stated that " . . . the additional information acquired by the arresting officers must in some sense be corroborative of the informer's tip that the arrestees committed the felony or, as in *Draper* itself, were in the process of committing the felony." While, at this point, the *Whiteley* Court was discussing the sufficiency of an informant's tip, we think no greater corroboration would be required to support an official police report.

opinion which requires a different result.

Murray's second search and seizure point concerns the seizure of an address book during the search of his residence at the time of his arrest. He contends that the scope of the search was too broad, since the book was found in a room other than that in which Murray was arrested, and that the officers should have obtained a search warrant.

In section V of our opinion in United States v. Baxter, 492 F.2d 150 (9th Cir. 1973), filed today, we discussed similar search and seizure questions raised by the defendants in the Group I appeals. The search of Murray's residence is legally indistinguishable from the searches there examined. We therefore similarly conclude that the search of Murray's residence and the seizure of the address book was lawful and that the address book was properly received in evidence.

Defendant Walker's search and seizure points concern the search of his motel room following his arrest by state officers on December 9, 1968, and the search of his residence and his automobile following his arrest by federal officers on December 17, 1968. His contentions are without merit.

 Walker expressly waived objections to the search of his automobile, and the objections would have been unmeritorious even if made at the trial. *See* Burge v. United States, 342 F.2d 408, 414 (9th Cir. 1965).

 Concerning the search of his motel room, Walker's contention that no announcement was made asks this court to redetermine the credibility of the Government's witnesses, contrary to all precedent. *See* Miller v. United States, 354 F.2d 801, 808 (8th Cir. 1966). Granting that Walker's testimony that there was no announcement prior to entry was supported by polygraph evidence while the contrary testimony of the arresting officer was not so supported, this does not warrant a determination that the trial court's finding that there was an announcement is clearly erroneous.

 Walker also contends that the officers' delay in making the arrest for some time after they had enough evidence to show probable cause renders the search of his motel room illegal. An arrest need not be made as soon as probable cause exists. Ward v. United States, 316 F.2d 113, 118 (9th Cir. 1963). But Walker argues that this deliberate delay in making the arrest shows that the officers' primary purpose was to allow Walker to enter the premises they desired to search. United States v. Martinez, 434 F.2d 190, 191 (9th Cir. 1970).

The delay in this case was no more than one day. The arrest was made on December 9, 1968. On December 8th, a surveillance of Walker was begun in response to information received which supplemented an informant's story. A reasonable inference is that the officers' delay was a result of their desire to further corroborate the informant's story. Since they had neither a search warrant nor an arrest warrant, the officers presumably understood the need for additional corroborative evidence. Delay in such circumstances does not render a search illegal. Chrisman v. Field, 448 F.2d 175, 177 (9th Cir. 1971). The officers' failure to obtain a search warrant is not decisive. Harris v. United States, 331 U.S. 145, 150–151, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947).

Concerning the search of Walker's residence following his arrest by federal officers on December 17, 1968, the only contention which requires examination is Walker's claim that the arresting officers did not comply with 18 U.S.C. § 3109. This statute requires an arresting officer to first give notice of his authority and purpose before breaking into a home to execute a search warrant. We have examined the point and find that such a notice was here given.

Defendant Roberts does not raise any search and seizure questions, other than those involving the Hernandez headquar-

ters in Mexico. This has been discussed in our opinion in the Group I appeals.

### IV. *Miscellaneous Contentions by Murray*

1. *Relevance of heroin seized at airport.* The grand jury alleged that the over-all narcotics conspiracy extended from a date to the grand jury unknown, to February 5, 1969. The evidence showed that the husband and wife team of Robert and Helen Hernandez was engaged in a narcotics smuggling operation from as early as December, 1964. On December 16, 1968, the operation came to a virtual standstill when Lannom and Wright, who were active in that venture, fled from Mexico to the United States. More than seven months prior to that event, on April 2, 1968, approximately ninety-one grams of heroin were found in a garment bag in Murray's possession at the San Francisco International Airport.

▮ The validity of the search which led to the seizure of this heroin has been considered in section III of this opinion. In addition to questioning the lawfulness of that seizure, Murray also argues that it should not have been received in evidence (exhibit 512) as there was no proof that this heroin had anything to do with the alleged over-all conspiracy to import heroin from Mexico, and to sell, conceal, and facilitate the transportation and concealment of such drugs after such importation.

In answer to this contention, the Government argues that, assuming this heroin had no connection with the alleged conspiracy, it is admissible to show intent, knowledge and identity relevant to the over-all conspiracy charge, and as tending to corroborate the testimony of Wright.

One element of the conspiracy count is that, after participating in the knowing importation of heroin from Mexico, the defendants conspired to sell, conceal, and facilitate the transportation of such narcotic drugs. The fact that Murray was caught with ninety-one grams of heroin at the San Francisco airport on April 2, 1968, did not prove that this particular heroin had been imported from Mexico as part of the conspiracy operation or otherwise. But it did tend to show that Murray had the knowledge and modus operandi which would enable him to conceal and transport substantial quantities of heroin.[6] In our opinion, the district court did not abuse its discretion in holding, in effect, that the relevance and probative value of this evidence outweighed its prejudicial effect as evidence of a separate crime.[7]

2. *Relevance of other items of evidence.* Murray argues that since he offered to stipulate that he was acquainted with Lauderdale, the reception in evidence of Murray's picture and a piece of paper with Murray's telephone number on it, found in Lauderdale's home, "can only be construed as an attempt to prejudice the jury by lending an illicit nature to what was never proven to be a conspiratorial relationship."

▮ When the photograph was offered in evidence, Murray objected to its relevancy. But he then made no complaint that the jury might draw invidious inferences from the presence of the photograph in Lauderdale's house. In any event, we think the photograph was relevant and probative on the factual question of Murray's identification as

---

6. The legal problem here is analogous to that presented where, with regard to one charged with possession, transportation or sale of heroin on a particular date, evidence is produced of prior possession of heroin by the defendant. This is permissible. *See* Enriquez v. United States, 314 F.2d 703, 714 (9th Cir. 1963).

7. By the time counsel for Murray objected to the receipt in evidence of the heroin (exhibit 512), most of the damage had been done. At the time a Government witness testified before the jury as to the circumstances under which the narcotics were seized from Murray, counsel for Murray voiced no objection to its relevance or probative value. The objection was first advanced two days later when the heroin was offered in evidence.

the "Lonnie" referred to in the Hernandez "customer book," and that Murray's post-trial fear that the jury might be prejudiced against him because Lauderdale had his photograph is somewhat fanciful.

▮ Similar to this argument is Murray's contention that the trial court should have stricken from a worksheet prepared by Wright, introduced as exhibit 415, the name "Lonnie." This evidence was relevant to the issue of the nature of the conspiracy. Murray does not specify how he was unfairly prejudiced by the admission of the worksheet, and we conclude that its admission, without adjustment, was not error.

▮ Murray additionally contends that he was unduly prejudiced by the reception in evidence of exhibit 400, consisting of ten and eight-tenths pounds of heroin. Murray contends that this heroin was totally unconnected to him in time or place.

This heroin, as explained in our opinion in the Group I appeals, was taken from "Emma," a smuggler for the Hernandez operation, when she crossed the border on December 16, 1968. This heroin was relevant and probative evidence pertaining to the question of the general nature of the Hernandez narcotics conspiracy. This factual question was involved in the Government's case against each defendant, including Murray. The trial court did not err in receiving this exhibit in evidence.

▮ 3. *Seizure of address book.* Murray argues that the seizure and use in evidence of his address book and entries therein violated his Fifth Amendment privilege against self-incrimination. Murray relies primarily upon an observation by Justice Bradley in Boyd v. United States, 116 U.S. 616, 633, 6 S. Ct. 524, 29 L.Ed. 746 (1886), to the effect that the seizure of a person's private books and papers to be used in evidence against him is not substantially different from compelling him to be a witness against himself.

*Boyd* involved a self-incrimination problem because the defendant was required by court order to produce a self-incriminating invoice. No such circumstance is present here. Actually, Murray's address book could have been seized as an instrumentality of the crime under the law as it existed prior to Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), which overturned the "mere evidence" rule. *Hayden,* of course, liberalized the rule as to what items may be seized.

▮ In `Hayden,* however, the court reserved the question of whether, in a search and seizure otherwise valid, the authorities could, in view of the privilege against self-incrimination, take items which are "testimonial" or "communicative" in nature. *See Hayden,* at 302–303, 87 S.Ct. 1642. But in United States v. Bennett, 409 F.2d 888, 896 (2d Cir. 1969), the Second Circuit held that such items can be taken during a lawful search and seizure and are admissible.[8] We agree.

In Blackford v. United States, 247 F. 2d 745, 753–754 (9th Cir. 1957), this court held that the privilege against self-incrimination protects one only against testimonial compulsion, and does not apply to real evidence taken from the person of the accused. The Second Circuit held to the same effect in *Bennett. See also,* United States v. Kee Ming Hsu, 424 F.2d 1286, 1290 (2d Cir. 1970). While Murray cites several other authorities in addition to *Boyd,* we find nothing therein which supports his position.

The address books were properly admitted in evidence.

4. *Sufficiency of indictment.* Murray contends that both counts of the indictment are defective in that they fail to state with particularity the crime

8. In *Bennett* the Second Circuit also said that Mr. Justice Bradley's "dicta" in *Boyd* has been "now largely repudiated by *Hayden,* 387 U.S. at 302–307, 87 S.Ct. 1642, 18 L.Ed.2d 782" 409 F.2d at 896.

with which he is charged and the facts thereof.

■ Prior to this appeal Murray did not question the sufficiency of the indictment. Where this is the case an indictment will ordinarily be held sufficient unless it is "so defective that by no reasonable construction can it be said to charge the offense for which the defendant [was] convicted." Muench v. United States, 96 F.2d 332, 335 (8th Cir. 1938).

With regard to count one, charging that Murray participated in a general narcotics conspiracy, Murray complains that there is nothing stated that pertains specifically to his own conduct. He points out that the date Murray is alleged to have joined the conspiracy is not stated in the count, nor does that count list any overt acts specifically attributable to him.

The statute in question, 21 U.S.C. § 174, sets forth all of the essential elements of the offense. Count one is substantially in the words of the statute, but it also provides additional information. The indictment recited that the conspiracy began at a date to the grand jury unknown, and continued to about February 5, 1969. Six overt acts were alleged, none of which named Murray.[9]

■ Since all of the necessary elements of the offense charged are expressly set forth in 21 U.S.C. § 174, the indictment is sufficient if it charges the offense substantially in the words of the statute. Brown v. United States, 222 F.2d 293, 296 (9th Cir. 1955). This rule is applicable to conspiracy counts. Grene v. United States, 360 F.2d 585, 586 (5th Cir. 1966). Under a 21 U.S.C. § 174 conspiracy charge it is not necessary to allege any overt acts. Hopkins v. United States, 405 F.2d 770, 772, n. 2, (9th Cir. 1969); Ewing v. United States, 386 F.2d 10, 15 (9th Cir. 1967);

Leyvas v. United States, 371 F.2d 714, 717 (9th Cir. 1967).

We hold that count one of the indictment was entirely adequate to charge the conspiracy offense in question.

■■ Count two of the indictment charges the substantive offense, under 18 U.S.C. § 1403(a), of knowingly using telephone, wire, and other means of communication in San Diego County in facilitating the commission of, and attempting to commit, the importation, concealment, and sale of heroin and cocaine, the penalty for which offense is provided in 21 U.S.C. § 174. Murray complains that, aside from referring to the use of communication facilities to facilitate the importation of drugs, count two "gives no other clues as to the facts behind the indictment. . . ." Murray also notes that the count does not allege that the communication facilities were used in interstate or foreign commerce, and does not give the date and place of the alleged telephone calls.

Count two is also substantially in the language of the statute, except that additional details are provided, such as the date of the communications ("[o]n or about December 1, 1968"), and the state and county in which the communication facilities were used (San Diego County, California). The statute, 18 U.S.C. § 1403(a), does not require that the communication facilities be used in interstate or foreign commerce. This aspect of the federal offense is met by the element, here adequately alleged, that the communication be pursuant to the commission, or attempt to commit, an offense proscribed by 21 U.S.C. § 174. United States v. Roviaro, 379 F.2d 911 (7th Cir. 1967), cited by Murray, does not require that the exact date and precise location of the telephone call be set forth in the indictment.

We conclude that count two of the indictment is not defective.[10]

---

9. On September 29, 1969, which was nearly four weeks before the commencement of the trial, the Government filed a bill of particulars listing fifty-six overt acts.

Three of these overt acts pertained to Murray, among others.

10. As indicated in discussing the sufficiency of the evidence as to the sub-

**5.** *Failure to record grand jury proceedings.* Murray argues that the indictment should have been dismissed because no record was kept of the grand jury proceedings that resulted in the indictment.

In all of the cases cited by Murray in support of this contention, a grand jury transcript was available which could have been supplied to the defendant. In our case, the grand jury proceedings were not reported and hence no transcript could be supplied.

Absent a request in advance that grand jury proceedings be recorded (*see* United States v. Thoresen, 428 F.2d 654, 666 (9th Cir. 1970)), the failure to record such proceedings is not a ground for dismissal of an indictment or reversal of a conviction. *See* United States v. Jackson, 448 F.2d 963, 971 (9th Cir. 1971), and cases there cited.

**6.** *Submission of indictment to jury.* Murray urges that the trial court committed prejudicial error in submitting "the entire indictment" to the jury for consideration. Murray states that the judge submitted the indictment with fifty names on it to the jury at the conclusion of the trial. According to Murray, there were many named individuals about whom no evidence was submitted at this Group II trial. Murray argues that since the jury members were not permitted to take notes during the trial, they may have assumed "that the size of the criminal operation was bigger than the testimony at their particular trial had revealed." This prejudice, Murray asserts, could not have been cured by a cautionary instruction, citing United States v. DeDominicis, 332 F.2d 207 (2d Cir. 1964).

 Murray's factual premise for this argument is somewhat faulty. It is true that the indictment was read to the jury and sent to the jury room. However, the specific names, but not the docket numbers, pertaining to indicted

co-conspirators were omitted. The trial court's ruling that the jurors should not take notes was at the unanimous request of the defendants, and was opposed by the Government. In any event, this is a matter within the discretion of the trial judge. Toles v. United States, 308 F.2d 590, 594 (9th Cir. 1962); Harris v. United States, 261 F.2d 792, 796 (9th Cir. 1958). We find no abuse of discretion here.

 Murray made no objection at the trial to the submitting of the indictment to the jury. Ordinarily an appellate court does not give consideration to issues not raised below, absent a showing that the attainment of fundamental justice is at stake. Hormel v. Helvering, 312 U.S. 552, 556–560, 61 S. Ct. 719, 85 L.Ed. 1037 (1941). *See also,* Rule 52(b), Fed.R.Crim.P. In our view the submission of the excised indictment to the jury did not deprive Murray of fundamental justice or constitute plain error.

We have nevertheless examined the point on the merits. Whether an accusatory pleading should be permitted to go to the jury room is a matter within the discretion of the trial judge. Souza v. United States, 304 F.2d 274, 280 (9th Cir. 1962). Both counts of the indictment named Murray and hence the entire indictment was relevant in connection with his prosecution. We perceive no abuse of discretion in permitting this indictment, with names of other co-conspirators not involved in this trial eliminated, to go to the jury.

The *DeDominicis* case on which Murray relies is distinguishable on the facts. That indictment contained 2,553 counts, but *DeDominicis* was charged in only twenty-nine counts. His case was severed and he was tried on the twenty-nine counts. The jury was furnished with only these twenty-nine counts, but they were numbered 3 and 1244–1271. The court held that this may have left the jury with the impression that this

---

stantive count, we could have declined, under the concurrent sentence rule, to

decide whether count two of the indictment is defective.

defendant was an integral part of an enormous criminal operation, whereas this was not the case. In our case, on the other hand, Murray was charged as a co-conspirator in the entire Hernandez operation, as described in the first count of a two-count indictment. Thus, there was no possibility that the jury would assume a larger criminal operation than that with which Murray was charged.

7. *Recording of Wright-Cohn telephone conversation.* A conversation between Wright and Cohn, which occurred on December 14, 1968, was recorded without Cohn's knowledge. A tape recording of that conversation was played in court and was introduced in evidence as exhibit 474. In the course of that conversation, the name "Lonnie" was mentioned. Murray contends that the recording of this telephone conversation by Wright at a time when he was a Government informer violated his right of privacy under the Fourth and Fifth Amendments.

■ Since Murray was not a party to this conversation, there was no invasion of his privacy. Murray has no standing to complain of the breach of Cohn's privacy. Alderman v. United States, 394 U.S. 165, 171–174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

■ Murray also advances one argument pertaining to the recording of this conversation, concerning which his standing cannot be questioned. This contention is that the divulgence of this telephone conversation was prohibited by that part of 47 U.S.C. § 605 which forbids any person not authorized by the sender from intercepting any radio communication and divulging or publishing the message to any person. However, the communication here in question was not a "radio" communication, and it was not intercepted.[11]

V. *Miscellaneous Contentions by Walker*

1. *Pre-trial access to principal Government witnesses.* Walker argues that the judgment against him must be reversed because he was denied pre-trial access to the principal Government witnesses, as guaranteed by the Sixth Amendment. The Government witnesses in question are Lannom and Wright.

■ Both sides have the right to interview witnesses before trial. Callahan v. United States, 371 F.2d 658, 660 (9th Cir. 1967). Exceptions to this rule are justifiable only by "the clearest and most compelling considerations." Dennis v. United States, 384 U.S. 855, 868–876, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).

On May 15, 1969, more than five months prior to the commencement of the trial, Walker moved for permission to interview Lannom and Wright. These witnesses were then in protective seclusion. The Government opposed the motion on security grounds. The motion was denied without prejudice to renewal twenty-four hours before trial. Walker's counsel questioned Wright extensively and under oath on October 20, 1969, which was seven days before the trial commenced. Counsel made no request that Wright submit to additional interviews and apparently made no effort, after May, 1969, to interview Lannom. Walker did not move for a continuance, nor did he request that the Government call witnesses other than Lannom or Wright during the opening weeks of the trial.

■ In denying Walker's pre-trial motion, the pre-trial judge had more than the Government's assertion that there was a security problem. It was then known that Lannom and Wright had become Government informers after serving for a long time as leading fig-

---

11. Prior to the amendment of June 19, 1968, this part of section 605 referred to "any communication." The 1968 amendment limited this provision to "any radio communication." Bubis v. United States, 384 F.2d 643, 647 (9th Cir. 1967), cited by Murray, discussed this part of section 605 as it existed prior to the 1968 amendment.

ures in the Hernandez narcotics operation. The pre-trial judge could, and apparently did, take judicial notice of the personal danger a narcotics conspirator risks when he becomes a turncoat and Government informer.[12]

██ Under the circumstances, we think the district court acted circumspectly in permitting Lannom and Wright to remain out of reach until shortly before the trial. In any event we are not convinced that Walker has been prejudiced.

██ 2. *Handwriting exemplars.* Walker argues that the Government unfairly refused to provide handwriting samples from Lannom and Wright so that the authenticity of documentary evidence could be established or attacked.

This contention is factually unsound. Walker's counsel was informed that the samples had been marked for identification as exhibits and were available in the clerk's office. If Walker's counsel needed additional exemplars he should have requested them while cross-examining the witnesses. *See* Clark v. United States, 293 F. 301, 305 (5th Cir. 1923).

3. *Denial of motion to depose foreign witnesses.* Walker argues that he was hampered in testing the authenticity and probative value of business records taken from the Hernandez home (exhibit 401), because the court denied his motion, made under Rule 15(a), Fed.R. Crim.P., to depose the Hernandezes as foreign witnesses.

Walker concedes that the motion was addressed to the district court's discretion. Under Rule 15(a), the court may order such a deposition if it appears that the prospective witness may be unable to attend or prevented from attending the trial or hearing. Walker's motion was denied on the ground that there

was no showing that the Hernandezes would be unable to appear at the trial.

██ Robert and Helen Hernandez were the first defendants named in the indictment under which Walker was prosecuted. Bench warrants were outstanding against them but could not be executed because the Hernandezes were in Mexico. In a sense, then, they were fugitives. It has been held that to allow the testimony of fugitives to be taken by deposition would amount to an injustice. United States v. Kelly, 349 F.2d 720, 769 (2d Cir. 1965); United States v. Rosenstein, 303 F.Supp. 210, 212 (S.D.N.Y. 1969); United States v. Van Allen, 28 F.R.D. 329, 346 (S.D.N.Y.1961). We agree. We also think it quite unlikely that the Hernandezes would have provided any information helpful to Walker. The trial court did not abuse its discretion in this regard.

4. *Denial of Walker's motion to exclude prior convictions.* Walker had sustained prior convictions for a 1932 forgery, a 1940 marijuana offense, a 1944 Mann Act violation, a 1954 state marijuana possession offense and a 1958 federal narcotics conspiracy. On April 25, 1969, six months before the commencement of the trial, Walker filed a formal request that the Government inform the court whether the Government would rely on any prior convictions or prior acts for either impeachment purposes or to show intent or knowledge. In this document Walker also stated that if the Government intended to use such prior convictions, defendant requested a pre-trial hearing by the court on the propriety of such use.

This formal request did not recite any reason why prior convictions should not be used, nor was it supported by affidavit. On August 11, 1969, the pre-trial

---

12. The subsequent representations made to the court by the Government tend to confirm the apprehension which the pre-trial judge reasonably entertained. The court was informed that there had been an attempt, presumably by the Hernandezes, to kill Joe Silva because he was thought to be an informer. Agents of the Hernandez family were said to be looking for Lannom. Robert Hernandez was shot three times in the head and twice in the back, causing him to lose his sight. It was also known that the Hernandezes had a trunk full of guns.

judge denied this motion without prejudice to renewal before the trial judge.

On October 27, 1969, the trial commenced. Two and a half weeks later, on November 13, 1969, Walker filed a motion, supported by several affidavits, that his prior convictions be excluded for either impeachment or for increasing the minimum mandatory sentence. The motion was based on the alternative grounds that impeachment by the use of his prior felony convictions would (1) violate the rule of Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763 (1965), and (2) be a violation of the Sixth Amendment in that it would permit impeachment or increased punishment on a prior conviction that is a result of an involuntary plea.

The trial court indicated that it believed the 1932 forgery conviction and the 1940 conviction for possession of marijuana were too remote, but ruled that the other three prior felony convictions (1944, 1954 and 1958) were not too remote and could be used for impeachment purposes. The trial court declined to rule on the validity of these three prior convictions. It did so on the ground that the court should have been asked to litigate the validity of these prior convictions prior to trial.

The affidavits filed in support of Walker's motion did not recite any reason why the 1944 prior conviction was invalid. As to the 1954 conviction, Walker alleged, in a supporting affidavit, that he pleaded guilty pursuant to a plea bargain his attorney had arranged, which bargain was kept by the state. Walker alleged that he entered into this plea bargain only on the promise that his wife would be released, and asserted he was innocent of the charge.

As to the 1958 conviction, Walker alleged in a supporting affidavit that the conviction was invalid because, during the course of the trial on that charge, his attorney entered into a plea bargain on his behalf which Walker accepted, but concerning which Walker was not adequately informed of his rights.

Walker argues that his own testimony was virtually indispensable in combatting that of the Government witness, Lannom. However, he contends, the likelihood that, if he did, the Government would bring before the jury evidence of his 1944, 1954 and 1958 convictions, prevented him from taking the witness stand. Since he did not testify the Government did not produce evidence concerning these convictions.

We turn first to the contention that the 1954 and 1958 convictions were invalid because pleas of guilty were not voluntarily and intelligently given. In its plurality opinion in Loper v. Beto, Corrections Director, 405 U.S. 473, 480–483, 92 S.Ct. 1014, 31 L.Ed.2d 374 (1972), the Supreme Court concluded that the use of convictions constitutionally invalid under Gideon v. Wainwright, 372 U.S. 355, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (deprived of assistance of counsel) to impeach a defendant's credibility deprives him of due process of law. We assume, for present purposes, that a deprivation of due process would similarly occur if the prior convictions were unconstitutionally invalid for any other reason, such as pleas of guilty which were not voluntarily and intelligently given.[13]

However there are two reasons why, in our opinion, the trial court's refusal to rule on the validity of the 1954 and 1958 prior convictions is not reversible error.

 One of these is the reason given by that court—the request for such a ruling came too late. Walker sought

13. We do not, of course, assume that Walker's 1954 and 1958 convictions were in fact invalid. See Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L. Ed.2d 427 (1971); Cortez v. United States, 337 F.2d 699 (9th Cir. 1964). Nor do we assume that the defects therein, if any, were of a kind which can be examined at this late date. In Loper v. Beto, *supra*, the asserted defect being lack of counsel, there was no retroactivity problem. See 405 U.S. at 483, 92 S.Ct. 1014, 31 L.Ed.2d 374.

this ruling in the midst of the trial. Had the trial court undertaken to litigate the validity of those prior convictions at that time, an extensive evidentiary hearing would have been required. This would have occasioned an intolerable interruption in what was, in any event, to be a long jury trial. Walker offers no reason why he could not have made his motion prior to the trial, after the trial judge had been assigned to the case. In our opinion, the motion was untimely. *See* United States v. Allison, 414 F.2d 407, 410 n. 5 (9th Cir. 1969).

 The second reason why, in our opinion, the trial court's refusal to rule on the validity of the 1954 and 1958 convictions is not reversible error lies in the fact that Walker chose not to testify and these prior convictions were therefore never brought before the jury. This reason also calls for rejection of Walker's argument that the court should have ruled that the 1944, 1954 and 1958 convictions should be excluded under the rule of Luck v. United States, 121 U.S. App.D.C. 151, 348 F.2d 763 (D.C.Cir. 1965).[14]

In electing not to take the witness stand, Walker waived any objection regarding the admissibility of evidence concerning the 1944, 1954 and 1958 prior convictions. Had Walker taken the witness stand, and had this led the Government to produce evidence concerning the prior convictions, and had Walker objected thereto, he would have preserved the issue for appellate review.

But here all he can complain of is the failure of the trial court to render an advisory opinion in advance of any evidentiary problem facing the court.

It would no doubt be helpful to defendants if they could obtain, in advance of trial, a complete outline of the ground rules which would be applied, and a trial court may, in its discretion, follow such a course. But appellate issues must be based upon actual trial incidents, for until then it cannot be certain what would have occurred. We cannot rule in a vacuum on the correctness of an advisory ruling, or on the failure of a trial court to give an advisory ruling, because at that stage in the proceedings any prejudice is problematical and purely speculative.[15]

We think the rationale of Shorter v. United States, 412 F.2d 428 (9th Cir. 1969), applies here. In *Shorter* the defendant received an advisory opinion of the trial court to the effect that it would not apply the rule laid down in *Luck, supra*. The defendant then took the stand and offered evidence of the prior felonies himself, as part of his testimony. We concluded in *Shorter* that the defendant could not complain on appeal, for his actions were a matter of trial strategy. *Cf.,* United States v. Haili, 443 F.2d 1295, 1298–1299 (9th Cir. 1971).

We conclude that there was no reversible error with regard to Walker's efforts to exclude evidence of the 1944, 1954 and 1958 prior convictions.[16]

14. The *Luck* rule was at least implicitly approved in United States v. Allison, 414 F.2d 407, 411–412 (9th Cir. 1969), although the *Allison* court noted that in Burg v. United States, 406 F.2d 235, 237–238 (9th Cir. 1969), a concurring opinion suggested that this should be done only in banc. *See also,* Shorter v. United States, 412 F.2d 428, 430 (9th Cir. 1969).

15. Walker cites Brown v. United States, 125 U.S.App.D.C. 220, 370 F.2d 242 (D.C.Cir. 1966), for the proposition that failure to give such an advisory opinion may be reversible error notwithstanding the defendant's failure to testify. However, the precedent value of this ruling is

clouded by the fact that the *Brown* court also gave another ground for reversal, namely, prosecutorial misconduct during argument to the jury. It may be that what the court said about the advisory opinion should be regarded merely as directions to the trial court concerning the retrial which, in any event, must be had.

16. It is unlikely that the prior convictions affected the sentence imposed upon Walker. Under 21 U.S.C. § 174, since repealed, the prior convictions would have precluded the trial court from imposing a sentence of less than ten years. That the trial court had no disposition in that

5. *Instructions given and refused.* While Walker complains of several instructions given, and the refusal to give requested instructions, we find only one such argument with sufficient merit to warrant discussion.

This pertains to an instruction given to the effect that (1) if there is one conspiracy and the defendant is a member, convict him; (2) if there is one conspiracy and the defendant is not a member, acquit him; (3) if the defendant is not a member of one conspiracy but is a member of another, acquit everybody.

Walker argues that this kind of instruction could misguide the jury into thinking that an acquittal of certain defendants might permit a finding of a single conspiracy among all other defendants. This kind of instruction has been condemned by the Second Circuit on the somewhat different ground that it is equivalent to an instruction that the jury could not acquit one defendant on the conspiracy count without also acquitting the other defendants on that count. *See* United States v. Kelly, 349 F.2d 720, 757 (2d Cir. 1965).[17]

Defendant Murray requested an instruction of this nature. Defendant Roberts requested two instructions of this kind, but now complains that the instruction amounted to "plain error."

Counsel for Walker and the other defendants expressly stipulated that any instruction offered on behalf of the individual defendants would be deemed to be offered on behalf of all defendants. It is true, however, that counsel for Walker objected to this instruction at the time the instructions were being settled.

In the context of this case we are unable to see how this instruction could have prejudiced Walker. Of all the defendants involved in these Group II appeals, the Government's evidentiary case against Walker was the strongest. *Cf. Kelly, supra,* 343 F.2d at 757.

 We conclude that the instruction in question was harmless as to Walker. If defendants Murray and Roberts are deemed to have joined in this particular argument by Walker, they are precluded from prevailing, under the doctrine of invited error.

6. *Other contentions by Walker.* Walker has advanced several other arguments on this appeal. All have been examined, but we find none of them has sufficient merit to warrant discussion.

The judgments of conviction, and sentences, on count one of the indictment in these Group II appeals are affirmed. The judgments of conviction of defendants Roberts and Walker on count two are reversed.

direction is indicated by the fact that the sentence actually imposed was fifteen years.

17. The trial in the present case occurred before the filing of the opinion in United States v. Estrada, 441 F.2d 873, 878 (9th Cir. 1971), holding that the trial court did not err in denying the defendants' request for a similar instruction, because such an instruction is unjustifiably favorable to the *defendants.* Said the court, in *Estrada:*

"Even if there were sufficient evidence to prove that six defendants conspired together, appellant's proposed instruction would demand a verdict of not guilty because the seventh defendant did not participate in the conspiracy, a wholly erroneous result. (*See* United States v. Kelly (2d Cir. 1965) 349 F.2d 720, 757–758, cert. denied (1966) 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544.)" 441 F.2d at 878.